**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

**ST. JOHNS RIVERKEEPER, INC.**              **Case No.:  3:17-cv-398-MMH-MCR**
           **Plaintiff,**

**v.**

**UNITED STATES ARMY CORPS OF
ENGINEERS,**
              **Defendant.**

**v.**

**JACKSONVILLE PORT AUTHORITY,**
              **Intervenor.**
_____

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW

Plaintiff, St. Johns Riverkeeper, Inc. pursuant to Rule 65(a) of the Federal Rules of Civil Procedure and Middle District Local Rules 3.01 and 4.06, files this Motion for a Preliminary Injunction and Supporting Memorandum of Law to preserve the status quo by enjoining the Army Corps of Engineers ("Corps") and The Jacksonville Port Authority ("JaxPort") from violating the National Environmental Policy Act ("NEPA") by dredging the St. Johns River commencing in mid-December 2017 and continuing thereafter until such time as the Corps has satisfied its NEPA obligations as set forth herein.

## I.  MOTION FOR PRELIMINARY INJUNCTION

## A.  INTRODUCTION

The Corps and JaxPort have recently undertaken efforts that will frustrate this Court's review of this case by contracting for dredging to begin in mid-December--a month before the briefs are due in this case.

1.   The contract to commence dredging violates NEPA because there has been no EIS economic analysis prepared for an 11 mile dredge and the EIS prepared for the 13 mile dredge is inapplicable to the planned dredge.

2.   Additionally, a Supplemental Environmental Impact Statement ("SEIS"") is required to determine the flooding impacts of dredging in light of flooding from Hurricane Irma which constitutes new information and circumstances for which NEPA requires supplementation.   As this motion was being finalized on December 1, 2017, the St. Johns Riverkeeper received a Public Notice from the Corps in which the Corps acknowledged its obligation for NEPA evaluation of Irma flooding on the Jacksonville Harbor Navigation Project.

3.   The lack of an EIS for the 11 mile dredge and the lack of a supplemental EIS for post-Irma increased flooding both require that the planned December dredging be enjoined until NEPA compliant studies have been completed.

## B. FACTS

### 1. Procedural Posture of the Case

4.   The St. Johns River has undergone several rounds of dredging to ever-deeper depths.  [FSEIS, pp.2-3].[1]  The Corps and JaxPort began preparations for the current proposed dredging in 2005. [FSEIS, Exec. Summ. ii].   The Corps NEPA review was accelerated by Executive Order, which reduced the study period by 14 months. The Corps completed its Final Integrated General Reevaluation Report II and Supplemental

---

[1] Until the Administrative Record is filed, the FSEIS can be reviewed at:
http://cdm16021.contentdm.oclc.org/cdm/ref/collection/p16021coll7/id/2118

Environmental Impact Statement ("FSEIS") on the 13 mile, $684-million dredge in April, 2014.

5.    On April 7, 2017 the St. Johns Riverkeeper filed its initial Complaint to enjoin Defendants from dredging until the Corps had complied with NEPA. [Doc. 1].  At the time the Complaint was filed, no part of JaxPort's dredging plan had been funded.  Riverkeeper anticipated that this case could be heard on the merits prior to any dredging taking place.

6.    In the six (6) months since the Complaint was filed, the Army Corps has not filed the Administrative Record with the Court.  At the status conference on August 1, 2017, this Court ordered the Corps to file the Record December 4, 2017 and further ordered that briefs be due on January 18, 2018. [Doc. 18].

7.    At the status conference, the Riverkeeper advised the court of its concern that JaxPort only intended to dredge 11 miles, instead of 13, which would not extend all the way to the MOL terminal where almost all of the dredging benefits would be realized. In response to the Court's questioning, JaxPort confirmed that it only intended to dredge 11 miles instead of 13. [Doc. 19, p.18].

8.    Since the briefing schedule was established, JaxPort and the Corps have taken new actions which will frustrate this Court's review on the established schedule.  The Corps and JaxPort secured $21.5 million in partial federal funding to dredge. In late September, the Corps, awarded a contract to begin dredging the first phase of the 11 mile project starting in mid-December of 2017.  [Exh. B – Rinaman ¶16, Attch. 1].

9.    Additionally, the recent historic flooding suffered by Jacksonville as a result of Hurricane Irma has brought into sharper focus the impact of the increased flooding that

the dredging will cause and its impacts constitute new information that must be reviewed by the Corps prior to commencement of dredging. [Exh. A - Stalker].

10.   Accordingly, on November 3, 2017, the St. Johns Riverkeeper filed its Amended Complaint to address the failure to prepare an EIS for the 11 mile dredge and the failure to prepare an FSEIS to address the flooding danger shown by Irma. [Doc. 21].

**2. The April 2014 FSEIS for the 13 Mile Dredge Plan**

11.   JaxPort is the local sponsor of the effort to dredge the St. Johns River to attract larger "post Panamax Generation-2" (PPX-2) ships [FSEIS, Exec. Sum.  p.iii].

12.   In accordance with NEPA, the Corps prepared a Final Environmental Impact Statement ("FSEIS") analyzing JaxPort's proposed alternatives for dredging. Because the proposed dredging is a navigation project the Corps was required to prepare a detailed economic analysis of the viability of the dredging alternatives. [FSEIS, p. 162].   A navigation project must contribute to the net economic development ("NED") of the United States or it cannot go forward. [FSEIS, Appx. B: Economics p. 7]. The analysis to determine viability is expressed as the benefit–cost ratio ("BCR"). All costs necessary to realize NED benefits are NED costs which must be included in the BCR calculation. [FSEIS, APPX. B: p. 97].

13.   With regard to the project's economic viability, the Corps stated that the FSEIS would answer this question:

> Is it in the federal interest to modify the Jacksonville Harbor navigable waterway to accommodate Super Post-Panamax vessels (PPX2)?  [SEIS, Appx. B: Economics, p. 2].

14. To answer the question in economic terms, the Corps analyzed different dredging lengths and depths. JaxPort's initial plan was to dredge 20 miles to a depth of 50 feet. [FSEIS, Exec. Summ. p. iv].

15. The Corps therefore began its analysis with JaxPort's initial request to evaluate a 20 mile dredge. Preliminary benefit-cost analysis showed no NED benefits for the last 6 miles. Accordingly, JaxPort reduced the length to 14 miles. Analysis of the 14 mile dredge similarly showed that no large container ships were expected to travel beyond the MOL terminal so there were no NED benefits beyond mile 13. [FSEIS pp. 120 – 121].

16. JaxPort's Strategic Master Plan, issued December 5, 2013, recognized the air draft restriction at Dames Point for the next generation of containerships to be able to reach the MOL terminal. [Exh. B - Rinaman ¶ 14, Attach. 1].

17. Nevertheless, JaxPort had the Corps evaluate a 13 mile dredge. Accordingly, the economic question JaxPort had the Corps answer with the FSEIS was:

> Is deepening of the first 13 river miles economically justified, and if yes, to what depth?" [SEIS §2.4, P. 84 (emphasis added)].

18. JaxPort also eliminated various depths from Corps consideration as they were determined infeasible. The Corps ultimately determined that the NED was maximized at 45 feet. Under the applicable law, 45 feet would be the required approved dredge depth. However JaxPort requested the Corps approve a 47 foot dredge depth as the "'Locally Preferred Plan." The Corps agreed. [FSEIS p. 123 – 24].

19. The Corps' answer to the question posed for a 13 mile, 47 foot, $684 million dredge was "yes," because it yielded a low but positive BCR of 2.7. [FSEIS p. 124]. Since the Corps did not study the 11 mile alternative the answer to that question for an 11 mile dredge is unknown.

20.   The BCR is adversely affected by removal of 2 miles from the dredging template because it halts the dredging short of the terminal operated by Mitsui OSK Lines with its trading partner TraPac (hereafter "MOL"). [FSEIS p. 88].  The MOL terminal is where the Corps has determined almost all the benefits are realized from the proposed dredging.

### 3. The Significance of the MOL Terminal to the Economic Analysis

21.   MOL is a global leader in the shipping business.  MOL is particularly strong in the far-east, which is seeing tremendous growth. The East-West trades are forecast to be the dominant container trade for JaxPort. [FSEIS, Appx. B: Economics, p. 72].  MOL also services most of the rest of the world.  [FSEIS 88- 89; SEIS].

22.   Of particular significance here is that MOL is responsible for bringing the east-west containership trade to JaxPort.  [SEIS p. 88].  Prior to MOL constructing its Dames Point terminal, JaxPort was primarily a regional container port for Puerto Rico and the Caribbean with limited service to South America.  [FSEIS p. 88].

23.   MOL's terminal was built in 2009 for $300 million. [FSEIS, Appx. B: p. 6]. It is west of the Dames Point Bridge, at River Mile 11.5.   [SEIS, P. 88; 34, 36 (10 nautical miles)].   The Dames Point Bridge is located 10.7 River Miles (statute miles) from the ocean.  [SEIS p. 17].

24.   MOL's terminal has state-of-the-art systems, equipment, infrastructure, roadways, and buildings.  [FSEIS p. 89; Appx. B: p. 34, 2.1.1.3].  The terminal has the only berths of sufficient length to handle the 1100 foot-plus PPX2 design vessel of the Corps and PPXZ container cranes.  [FSEIS 36 & 102 Appx. B: p. 34, 2.1.1.3].

25.   MOL dominates the large container ship traffic at JaxPort.  All of the very largest vessels coming to JaxPort call at the MOL terminal. Most of the next-largest size vessels,

also call at the MOL terminal.  [FSEIS, Appx. B: Economics, p. 58].  The Corps anticipated that in the future the increasingly larger ships will continue to call at the MOL terminal at Dames Point.  [FSEIS, Appx. B: Economics, p. 58].

26.   The Corps calculated that the major container trade routes generate 90% of the benefits expected to be realized from the proposed dredging. More than 70% of those benefits arise from the far-east Panama and Suez Canal trade routes monopolized by MOL at JaxPort.  [FSEIS, Appx. B: Econom., p. 108, 67, 39].

**4. The Unstudied 11 Mile Dredge**

27.   JaxPort's Strategic Plan, issued December 5, 2013, recognized the air draft restriction at the Dames Point Bridge. [Exh. B - Rinaman, ¶ 14, Attach. 1].  JaxPort, in February of 2016, was involved in negotiations with MOL and others to move MOL east of the Dames Point Bridge to Blount Island.    [Exh. B - Rinaman, ¶ 14, Attach. 2].

28.   After Riverkeeper's initial Complaint was filed, JaxPort publicly announced, that it was going to proceed with an 11 mile dredge, asserting savings would cut the $684 million cost to $484 million.  [Exh. B - Rinaman, Attach. 3 - JaxPort Bd. Min. June 2017].

29.   On June 8, 2017, JaxPort provided Jacksonville City Council members with a packet relating to its dredging plan.  It included a spreadsheet showing the 11 mile dredge cost of $484 million and requested a $47 million contribution from the City.  Also in the packet was a "Joint Statement of Intent" signed by JaxPort and MOL to facilitate the 11 mile dredge by agreeing to try to agree to move MOL to Blount Island and relocate existing shipping tenants.  Also in the packet is a spreadsheet showing the $21.5 million federal funds and an email from the Corps of Engineers indicating receipt addressing these federal funds.  [Exh. B - Rinaman, Attach. 4].

30.   At JaxPort's June 26, 2017 Board meeting, it voted to approve millions of dollars of expenditures for the 11 mile, $484 million dollar dredge. [Exh. B - Rinaman, ¶ 15].

31.   On October 23, 2017, at the JaxPort Board Meeting, the Corps and Jaxport both indicated that they were only focused on an 11 mile dredge.  However, they purported to be keeping the 13 mile dredge open.  [Exh. B - Rinaman, ¶ 17].

32.   Also at the October 23, 2017 Meeting, Eric Green reported JaxPort was still negotiating with MOL regarding moving MOL to Blount Island.  [Exh. B - Rinaman, ¶ 18].

**5. The Costs Associated With Moving MOL**

33.   If MOL was to move to Blount Island, there will be significant costs. At one point, MOL was demanding that JaxPort assume MOL's debt associated with its $300 million cost. [Exh. B - Rinaman, Attach. 2].  JaxPort Board minutes also reflect that to make room for MOL at Blount Island, other shippers must be moved elsewhere and that JaxPort was in "discussions" with them.

34.   The costs of relocating MOL and other shippers may substantially exceed the costs savings realized by the reduction in dredging costs.  In fact, JaxPort's Strategic Plan indicates that costs associated with container ship needs and relocations could cost many hundreds of millions of dollars.  See, Exh. B - Rinaman, Attach. 1.

### 6. Flooding:  Tide and Storm Surge Increases

35.   Dredging causes increased storm surge and tide heights because the change in the geometry of the river channel allows a much greater volume of water to travel up the river, causing water levels during high tides and storm events to rise higher and faster. [Exh. A - Stalker, ¶13].

36.  The Corps, using hurricanes Dora and Frances calculated that dredging will increase water levels from tides by .3 feet and storm surge height generally by .25 to .5 feet, and as much as .7 feet in some areas. [SEIS pp. 173-4, Table 39; Exh. A - Stalker, ¶15].

37.  In light of the dredging-caused increased water levels from tides and storm surge, the Corps' standalone FSEIS assertion that dredging will not induce flooding is incorrect. [Exh. A - Stalker, ¶12].

38.  Jacksonville and its surrounding areas are largely flat with a low gradient and are subject to flooding at times of high water. Some areas of Jacksonville have experienced repeated flooding simply from high tides or tides associated with normal storm events.  Flooding of these areas will be aggravated by the dredging-caused increased tide and storm surge heights, and dredging will likely increase the extent and frequency of such events.  [Exh. A - Stalker, ¶17].

39.  The Corps' water level increases prediction was made using information available prior to Irma. Irma now provides the most recent and most detailed information available, and should be used in any modeling intended to calculate flooding scenarios along the St. Johns River.  [Exh. A - Stalker, ¶16, 17].

40.  If Irma flooding data were used in the Corps model, it likely would predict still greater increases in storm surge and tide heights caused by dredging.  This is true even though the model has significant deficiencies that will likely obscure and minimize the full flooding impacts. [Exh. A - Stalker, ¶19].

41.  The model used by the Corps is a storm surge and tide model employed as a proxy for a flooding model. As a result it does not accurately predict the flooding to be

caused by the dredging. In particular, the Corps model does not account for the dynamics of increased surge interacting with increased outflows from tributaries during a storm event. It is also deficient because rainfall and inflows from tributaries are completely ignored by the model, thereby failing to account for vast amounts of water in the system. [Exh. A - Stalker, ¶ 20 – 21].

42. Additionally, the model is deficient because it contains artificial boundaries which predict water level elevations that have never been reached in historical storm events. While the model predicts these excessive water levels at its artificial boundaries, in the real world, the water has to flow elsewhere, either backing up into tributaries or flooding low lands or other occupied areas.   [Exh. A - Stalker, ¶ 22].

43. Irma caused billions of dollars of flooding damage. The costs of the dredging exacerbation of flooding in the future is unknown, but it is likely to be substantial and reoccurring.   [Exh. A - Stalker, ¶23].

44. Flooding causes significant impacts to the human environment. It's societal, economic, and environmental impacts are substantial.   Storm events wash additional pollution into the River when the floods recede from streets, buildings, and sewage stations.  With virtually every significant flooding event, thousands and sometimes millions of gallons of raw sewage are released into the river. These impacts adversely affect the river and therefore the Riverkeeper organization and its members. [Exh. B - Rinaman ¶ 8-9; Exh. C – Lembcke; Exh. D – Busey; Exh. E - Pajcic].

45. On December 1, 2017, while The St. Johns Riverkeeper was preparing to file this Motion, it received a letter from the Army Corps dated November 30, 2017.  It says in relevant part:

[T]o further the purposes of NEPA, the Corps will also consider whether the recent flooding conditions in the vicinity of the Jacksonville Harbor Navigation Project following the 2017 nor'easter and hurricane Irma constitute significant new circumstances or information relevant to environmental concerns and bearing on the Jacksonville Harbor Navigation Project or its impacts.

[Exh. B, Rinaman, ¶ 19, Attach. 5].

### 7. Standing

46.  St. Johns Riverkeeper is a Florida non-profit membership-based corporation with its primary place of business in Jacksonville, Florida.  It is dedicated to the protection, preservation, and restoration of the ecological integrity of the St. Johns River watershed for current users and future generations.  It monitors the environmental quality of the St. Johns River and its tributaries and organizes regular boat trips for its members and citizens to educate them about the River and its management. St. Johns Riverkeeper has over 1300 members who use and enjoy the waters of the St. Johns River including its tributaries and estuarine marshes for recreational, scientific, aesthetic, and commercial purposes including boating, fishing, scientific monitoring, and observing birds and other wildlife.  Many Riverkeeper members live, work, or own commercial establishments on the banks of or very near to the river and are directly affected by flooding and exacerbation of pollution caused by flooding.  [Exh. B - Rinaman, ¶3, 10].

47.  Riverkeeper and its members have averred that they use and enjoy the river for recreation and aesthetic reasons, that their use and enjoyment of the river is diminished as a result of pollution of the kind that the St. Johns Riverkeeper challenges here. Additionally, they have been and will continue to be harmed by pollution, flooding, including its human, societal and pollution aggravating impacts.  [Exh. B – Rinaman, ¶12-13; Exh. C - Lembcke; Exh. D – Busey; Exh. E – Pajcic].

48. The above-described aesthetic, conservation, recreational, commercial, scientific, and procedural interests of St. Johns Riverkeeper and its respective members have been, are being, and, unless the relief prayed for herein is granted, will continue to be adversely affected and irreparably injured by the failure of the Defendant to comply with its obligations under environmental and procedural statutes designed to minimize needless damage to the human environment. [Exh. B - Rinaman, ¶13].

## II. MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

### A. The Standard of Review

The standard of review of Agency NEPA action under the APA is generally subject to the deferential arbitrary and capricious standard.  Sierra Club v. Martin, 168 F.3d 1, 3 (11th Cir. 1999). In the instant case, however, the Corps has simply ignored the challenged issues.  There is no record support for the failure to prepare a BCR for the 11 mile dredge or the SEIS for Irma flooding. The Corps' failures in this regard prevent the court from according it any deference.  Martin, 168 F.3d at 4 (court cannot defer to agency absent record support); see also, Forest Service Employees for Envtl. Ethics v. United States Forest Service, 397 F.Supp 2nd 1241, 1254 D.C. D. Mont. 2005) (when agency acts without consulting NEPA, that action is not infused with factual, scientific or technical information for which the agency is entitled to deference).

Furthermore, the court "must overturn agency actions which do not scrupulously follow the regulations and procedures promulgated by the agency itself." Florida Wildlife Federation, 401F Supp.2nd at 1307, quoting Sierra Club v. Martin, 168 F.3d 1, 4 (11th Cir. 1999) (citation omitted). In fact, the court is "duty-bound to overturn such actions. Florida Wildlife Federation, 401F Supp.2nd at 1307, citing Sierra Club v. Martin, 168 F.3d 1, 4

(11ᵗʰ Cir. 1999) (citation omitted).   Here, the Army Corps has violated applicable regulations requiring the economic analysis and benefit-cost calculation and SEIS requirements.  Accordingly, the court is duty-bound to order compliance with NEPA.

In this case, the failures are such that they are arbitrary and capricious and require an injunction regardless of the standard applicable.

## B. The Unviewed Plan to Dredge 11 Miles Violates NEPA

JaxPort has chosen to alter the extent of the dredging by reducing the dredge from 13 to 11 miles.  The Army Corps is acting on this imminent plan without undertaking the required NEPA economic analysis for the 11 mile dredge.

NEPA requires federal agencies "to the fullest extent possible" to prepare an EIS for "every recommendation or report on proposals for legislation and other major Federal action significantly affecting the quality of the human environment." Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 145 (2010), citing, 42 U.S.C. §4332 (2)(C).  If a court finds that an EIS is required but has not been prepared, or if the EIS fails to comport with the requirements of law, it must vacate and remand to the agency. Wilderness Watch & Public Employees for Envtl. Responsibility v. Mainella, 375 F.3d 1085, 1096 (11th Cir. 2004); Sierra Club v. Martin, 168 F.3d 1, 5 (11ᵗʰ Cir. 1999) Defenders of Wildlife v. Salazar, 870 7F Supp 2ⁿᵈ 1271, 1308 –09 M. D.  Fla. 2012); Sierra Club v. Antwerp, 709 F.Supp 2ⁿᵈ 1254, 1272 (S. D. Fla. 2009), *affd. on other grounds,* Sierra Club v. Antwerp, 362 Fed. Appx. 100, (11ᵗʰ Cir. 2010).

NEPA requires that an economic analysis and benefit-cost ratio be prepared for a Navigation project to determine whether the project will contribute to the national economic development ("NED"). A purpose of an economic analysis in NEPA is to weigh

the environmental, societal and economics of a project to determine viability. 40 C.F.R. §1502.23. The objective is to "contribute to national economic development consistent with protecting the nation's environment." Economic & Envtl. Prin. & Guidelines for Water and Related Land Resources Implementation Studies, at §2.]. The Corps has adopted these Principles and Guidelines and states that the purpose of resource planning is:

> to contribute to national economic development (NED) consistent with protecting the Nation's environment, in accordance with the national environmental statutes, applicable executive orders, and other Federal planning requirements. ER 1105 – 2 – 100 at 1 – 1 & 2-2a.

The Corps acknowledged in its JaxPort FSEIS that analysis of the NED was "required" and prepared an economic analysis, including calculation of the BCR to determine whether the 13 mile dredge contributed to the NED. [FSEIS, p. 162 & Appx. B]. Notwithstanding this requirement, the Corps did not complete the economic analysis or calculate a BCR for the 11 mile dredge that is now being implemented.

The economic requirement for navigation projects is incorporated into NEPA and made mandatory by the relevant regulations. Federal navigation projects are subject to the provisions of the Water Resources Planning Act ("WRPA") which requires an economic evaluation for all water resources projects and specifically for navigation projects. 42 USC a §1962a–2(b). Water Resources Council regulations require that WRPA economic evaluations be "fully integrated" into NEPA evaluations. Economic & Envtl. Prin. & Guidelines for Water and Related Land Resources Implementation Studies, § I, 1.1 (e) & (f). Similarly, binding NEPA regulations of Council on Environmental Quality provide that:

> If a cost-benefit analysis relevant to the choice among environmentally different alternatives is being considered for the proposed action, it *shall* be incorporated by reference or appended

> to the statement as an aid in evaluating the environmental consequences. 40 CFR parts 1502.23. (Emphasis supplied).

Accordingly, the failure to complete the required economic analysis violates NEPA.

It has long been recognized that misleading economic assumptions could defeat the main function of an EIS by "impairing the agency's consideration of adverse environmental effects of the proposed project." Hughes River Watershed Conservancy v. Glickman, 81 F.3d 437, 447 (4th Cir.1996), *citing* South La. Envtl. Council, Inc. v. Sand, 629 F.2d 1005, 1011 – 12 (5th Cir.1980). In the instant case there is a complete absence of the required economic analysis. Furthermore, reliance on the economic evaluation prepared for the 13 mile dredge is misleading. The Corps' 13 mile analysis demonstrates that dredging the last 2 miles is necessary to reach MOL's terminal and is crucial to the cost analysis. Between 70 and 90% of the benefits attributable to the dredging would be lost if dredging stops at 11 miles. Therefore, there is no basis on which the 13 mile analysis can stand-in for the required NEPA analysis of an 11 mile dredge. Furthermore, the Corps analysis of various alternatives demonstrates that minor changes in length and depth can render the project infeasible. Here, the evidence is very strong that the 11 mile project is not economically justified. In any event, it has not been studied as required by NEPA and the project cannot go forward until it has.

The effort to dredge the St. Johns River was instigated by JaxPort which controlled every alternative considered. At various points in the Corps' NEPA analysis, JaxPort chose to have the Corps analyze alternative dredge lengths and depths as prior alternatives were determined to be infeasible. Despite JaxPort's knowledge of the need to stop east of the Dames Point Bridge and relocate MOL, it never had the Corps analyze an 11 mile dredge alternative.

15

NEPA's requirement that agencies develop and study alternatives has been identified as "the heart of the EIS." North Buckhead Civic Association v. Skinner, 903 F.2d 1533, 1540 (11th Cir. 1990), citing 40 CFR §1502.14.  NEPA further requires that the alternatives be identified and studied early in the process. North Buckhead, 903 F.2d at 1540.  The unstudied 11 mile dredge alternative was required to be studied by the Corps early in the process when other dredging lengths and depths were analyzed.  By ignoring the alternative that is now being pursued, defendants have violated the very heart of NEPA.

JaxPort has been moving toward an 11 mile dredge since at least 2013 when its Strategic Plan was completed.  It began negotiations with MOL and other JaxPort tenants as early as February 2016. It entered into a written agreement with MOL to facilitate the 11 mile dredge on May 17, 2017. It publicly announced its intention to dredge 11 miles, asserting it would save $200 million in dredging costs. On June 8, 2017, JaxPort distributed an information packet regarding the 11 mile dredge to the Jacksonville City Council requesting a contribution of $47 million.  On June 26, 2017, JaxPort's Board approved expenditures of millions of dollars based on the 11 mile, $484 million dredge. On August 1, 2017, JaxPort represented to this Court that its intention was to dredge only 11 miles. On October 23, 2017 JaxPort and the Corps further confirmed their plan was to dredge 11 miles. Accordingly, the 11 mile dredge is the plan being pursued and it has not been subjected to the rigors required by NEPA.

Notwithstanding these facts, after the status conference at which Riverkeeper raised red flags regarding the impropriety of the 11 mile dredge, Defendants began to change their rhetoric.  For example, at the October 23, 2017 Board Meeting, the Corps

with JaxPort in agreement, stated that it was only focused on the first 11 miles of dredging but to avoid the NEPA problems raised by Riverkeeper with an 11 mile dredge, claimed to be keeping the 13 mile option open.

NEPA does not permit such sophistry to avoid its requirements.  NEPA's purpose it to ensure that important effects are not overlooked or underestimated until "after resources have been committed or the die otherwise cast."  Florida Wildlife Federation v. U.S. Army Corps of Engineers, 401 F.Supp.2nd 1298, 1309 (S. D. Fla. 2005) *citing*, Robertson v. Methow Valley Citizens Council 492. S. 332, 349 – 50).  Yet, that is exactly what will occur if defendants are permitted to begin the planned dredge.   For all it appears, it is Defendants intend to avoid NEPA's required 11 mile analysis.

NEPA requires that the appropriate documentation and review procedures be completed prior to decisions being made.  Wilderness Watch & Public Employees for Envtl. Resp. v. Mainella, 375 F.3d 1085, 1094  (11th Cir. 2004) *citing* Robertson v. Methow Valley Citizens Council, 490 U. S. 332, 349, 109 S. Ct. 1835, 104 L.Ed. 2nd 351 (1989).  If JaxPort does not really know what course it may take, dredging cannot proceed. Such "shoot first" actions were condemned by the Eleventh Circuit in Mainella where the Park Service improperly used a motorized bus to transport tourists through Cumberland Island's wilderness preserve without performing NEPA analysis to determine its impacts.  The Eleventh Circuit reversed the summary judgement entered in favor of the Park, holding that NEPA required analysis of environmental impacts before action is taken. Mainella, 375 F.3d at 1087 & 1095-96.

Furthermore, NEPA requires that alternatives be presented in a comparative form, "thus sharply defining the issues and providing a clear basis for choice among options by

the decision-maker and the public." <u>North Buckhead</u>, 903 F.2d at 1541. Here, the analysis to determine the information for choice among options has not been done.

NEPA regulations are further violated here because the 13 mile scope of the project used to calculate benefits does not match the actual 11 mile scope of the project. <u>Florida Wildlife Federation</u>, 401 F Supp.2nd at 1330-10, *citing* 40 C.F.R. Part 325, App.  B §7(b)(3).

JaxPort has negotiated for years with MOL and other tenants to relocate MOL within the 11 mile dredge.  Agreement has been elusive.  At best there is an agreement to agree. As of October 23, 2017, negotiations were still ongoing.  What is certain, is that if MOL and other tenants are relocated it will entail substantial costs which must be determined in a proper economic analysis and a new BCR determined. Accordingly, the requirement for the appropriate economic analysis of the 11 mile dredge remains regardless of whether MOL relocates.

Furthermore, it appears that even with the required relocations there would still be an adverse affect on the prior BCR.  While it is claimed there will be a $200 million dollar dredge cost savings, the evidence is that the terminal to be abandoned by MOL was completed 8 years ago at a cost of $300 million.  JaxPort Board minutes demonstrate that MOL has demanded compensation for those costs.  In addition, the minutes and the JaxPort Strategic Plan indicate there will also be other costs associated with other tenant relocations.  The cost of those may also be in the hundreds of millions of dollars.

Moreover, all these costs must be included in the calculation of the NED.  The regulations provide that contributions to the national economic development ("NED") are increases in the net value of the national output of goods and services expressed in

monetary units.  This means that all costs and benefits must be included in the analysis.

If they are not, the purpose of the calculation is not served.  Calculating the NED requires

analysis of all implementation costs, other direct costs and associated costs. ER 1105 –

2 – 100 2-4 k1-4 (22 Apr. 2000).  If the relocation costs are not included as implementation

costs, they must either be accounted for as "other direct costs" or "associated costs."

Other direct costs include costs "directly required for a project or plan but for which no

implementation outlays are made." Id. at (3). JaxPort's strategic plan, its negotiations and

tentative agreement with MOL demonstrate that these costs are directly required for the

project at 11 miles. Whether the federal government, Jacksonville, JaxPort, MOL, or other

tenants pay for the relocations, they must be accounted for and included in the calculation

of the NED.

Moreover, even if the costs somehow are deemed not to qualify as other direct

costs, the relocation and related costs still must be included as associated costs.

Associated costs are those "necessary for the production of project outputs" even though

no project expenditure is made. Id.  Relocation of MOL and other tenants is necessary

for production of project outputs. In the absence of the move, the 11 mile dredge BCR

will be dwarfed by the project costs.

In light of JaxPort's current anticipation of ships of 13,000 TEU, size, the Corps'

use of a design ship of 8000 to 9000 TEUs for the 50 year project life was flawed.  These

facts, combined with JaxPort's decision to reduce the dredging template to 11 miles, lends

credence to the Riverkeeper's allegations regarding the air draft limitation at Dames Point.

However, for purposes of this motion, JaxPort's reasons for changing the dredging

template to 11 miles are irrelevant.  It does not matter whether the decision was made to

save the purported $200 million in dredging costs, to address the air draft problem, or for any other reason. It is the change to 11 miles - pursued in violation of NEPA - that is key.

Moreover, defendants cannot be permitted to dredge the first 2-3 mile segment without the required analysis. The full project effects must be analyzed ahead of time and as a whole.  As the court in Miccosukee Tribe held, analyzing one component of a plan without considering the overall project, is akin to reviewing a "bridge to nowhere." That metaphor is particularly apt here.  There is no point in spending $23 million to let the larger ships traverse only the first 3 miles of the St. Johns River.

Furthermore, allowing defendants to commence dredging now could prejudice the needed analysis in favor or completion.  Courts have recognized that allowing one phase to proceed before the required NEPA analysis is complete could "distort" the analysis and "skew it" toward completion.  Florida Wildlife Federation v. U.S. Army Corps of Eng., 404 F. Supp.2d 1352, 1363 (S.D. Fla. 2005).

Notwithstanding JaxPort's decision to pursue the unstudied and unquantified 11 mile dredge, the Corps and JaxPort have determined to expend federal funds on a dredging plan that has not received NEPA review and for which the benefits and costs remain unknown—all of which violate NEPA and must be enjoined.

## C.   A Supplemental EIS is Required Due to New Flooding Information Arising From Hurricane Irma.

NEPA requires "agencies to take a "hard look" at the environmental effects of their planned action, even after a proposal has received initial approval. Marsh v. Oregon Natural Resources Council, 490 U. S. 360, 374 (1989).   The Supreme Court held that NEPA regulations impose a duty on all federal agencies to prepare an SEIS if significant

new circumstances or information relevant to environmental concerns and bearing on the proposal or its impacts occur or if new significant impact information, criteria or circumstances relevant to environmental considerations impact on the recommended plan or proposed action. Marsh, 490 U. S. at 371, *citing*, 40 CFR §1502.9 (c) (1987).

The broad dissemination of information mandated by NEPA permits the public and other government agencies to react to the effects of a proposed action at a meaningful time. Marsh, 490 U. S. at 371 *citing*, Robertson v. Methow Valley Citizens Council 492. S. 332, 349 – 50). Here, absent the required study, the Public will have no opportunity to react. The dredging will stop at 11 miles and the public and officials asked to contribute millions of dollars to the effort may never be apprised of its viability as NEPA requires.

A case directly on point here is Miccosukee Tribe of Indians of Fla. v. United States, 2008 WL 11332080 (S.D. Fla. Nov. 14, 2008). In Miccosukee Tribe, the court found the Corps had violated NEPA and entered a preliminary injunction prohibiting it from beginning construction on a portion of the Tamiami Trail. The court found that NEPA required the Corps to prepare an SEIS for new information relating to flooding that would be caused by the project. Id. at *10 &*13. As in the instant case, in Miccosukee Tribe, the Corps had been working on that project for a number of years. Miccosukee Tribe, at * 3-4. Additionally, as here, the Corps was under pressure to accelerate its efforts on the project. Id. at *3.[2]   In Miccosukee Tribe, the Corps determined that the project would increase the water flow volume in the park but asserted it would not cause flooding. Plaintiffs there asserted that flooding would be significant-even disastrous. Id. at *10 &

---

[2] The preliminary injunction in Miccosukee Tribe was entered on November 13, 2008. Congress subsequently, in the "Omnibus Appropriations act of 2009, exempted the challenged action environmental laws, thereby depriving the court of jurisdiction causing dismissal of the case. Miccosukee tribe of Indians of Florida v. U.S., 650 F Supp 2nd 1235, 1238 – 39, 1243-44 (S. D. Florida 2009).

11. Plaintiff's also produced evidence that the Corps' subsequent assertion of a lesser water volume flow still indicated an increase in water level of a few inches and would still have serious impacts. Id.  The evidence in the instant case is similar. Riverkeeper's expert, Dr. Jeremy Stalker has similarly averred, contrary to the Corps' bald assertion of no flooding, that there will be dredge-caused flooding and that it will be significant and recurring. In light of the devastating flooding from Hurricane Irma, any increase in the amount of flooding resulting from dredging is relevant to the project, its viability and its impact on the human environment.

In Blanco v. Burton, 2006 WL 236-6046, at*7 -10 (E. D. La. 2006), plaintiffs asserted that the Gulf hurricanes of 2005 were exactly the kind of new circumstances that required an SEIS in relation to the sale of offshore oil and gas leases.  The court agreed, holding that Plaintiff's assertion that the impacts of the hurricanes required preparation of an SEIS." Id. at*10. The extensive and devastating flooding suffered by Jacksonville in the wake of Hurricane Irma similarly constitutes new circumstances that require preparation of an SEIS.

Unlike the instant case, where the Corps has undertaken no analysis whatsoever of the impacts and flooding associated with hurricane Irma, in both Miccosukee Tribe  and Blanco, the agencies actually prepared an Environmental Assessment ("EA") as a result of the flooding and Gulf hurricanes. Miccosukee Tribe at *3; Blanco at *3.  Even so, the courts faulted the agencies analysis. Miccosukee Tribe at *13; Blanco at *10.

Here, there has been no EA, however, the Corps has just released a Notice indicating it will now consider Irma flooding as required by NEPA. The admission that Irma

flooding must be properly evaluated for the dredging project requires the Corps and JaxPort be enjoined from commencing dredging until the required analysis is completed.

## D.  Preliminary Injunctive Relief is Warranted

Preliminary injunctive relief is warranted where the movant establishes (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) that the threatened harm to the movant outweighs whatever harm the injunction may cause to the nonmoving party; and (4) that the proposed injunction would not be adverse to the public interest. Klay v. United Healthgroup, Inc. 376 F.3d 1092 (11th Cir. 2004).

In Miccosukee Tribe, the court held that the tribe had shown substantial likelihood of success because the Corps had failed to consider all of the relevant factors regarding significant new information or circumstances relevant to environmental concerns.   A crucial aspect of this finding was the flooding to be caused by the project. 2008 WL 11332080 at*10.  Here, in addition to the reoccurring flooding, there are also violations of NEPA regulations with regard to analysis required.  Accordingly, the Riverkeeper has met its requirement to establish the substantial likelihood of success on the merits.

Similarly, In Miccosukee Tribe, the court held that irreparable harm results where environmental concerns have not been addressed by the NEPA process.  Id at*11, *citing,* Protect Key West, Inc.  v. Cheney, 795 F.Supp. 1552, 1563 (S. D. Fla. 1992) citing Sierra Club v.  Marsh, 870 2F 2nd 497, 504 (1st Cir. 1989).  Furthermore, the harm is not merely procedural. The risk resulting from a violation of NEPA is that real environmental harm will occur through inadequate foresight and deliberation.   Riverkeeper also will suffer irreparable harm by the impacts to the river that have gone unstudied and the inability of

the public to review the true costs against environmental harm.  Flooding will cause additional pollution to the river and harm to Riverkeeper members.  This constitutes irreparable harm.  Id.

The balance of harms also favors granting a preliminary injunction.  The Corps has now acknowledged the necessity to study the flooding impacts from Irma.  There should not be any dredging allowed that will "skew" the analysis in favor of continuing the project. Furthermore, where the likelihood of an environmental injury is high, as it is here, the balance of harms favors issuance of an injunction to protect the environment. Miccosukee Tribe, at*12, *citing* Amoco Prod. Co. v. Village of Gambell, AK. 480 U.S. 531, 545 (1987).

A preliminary injunction will serve the public interest because NEPA serves the public interest by protecting the public and assuring that the intent of the legislature is effectuated. An injunction will stop harm to the environment that would be caused by the implementation of the plan that violated NEPA. Id. at *12.

Finally, delay in the proposed dredging does not provide a basis to deny an injunction. This project has been long studied, and more time taken to comply with the law is in the public interest. Furthermore, as in Miccosukee Tribe, any delay attributable to granting the motion is in part due to the actions of JaxPort and the Corps in failing to request or perform the required analysis regarding the 11 mile dredge and delaying with regard to the Irma flooding analysis until after Riverkeeper filed its Amended Complaint.

## E.  St. John Riverkeeper Has Standing to Bring this Action

A party must satisfy 3 requirements to have Constitutional standing to bring suit: (1) injury-in-fact; (2) a causal connection between the asserted injury-in-fact and the challenged action of the defendants; and (3) the injury can be redressed by a favorable

decision. Black Warrior Riverkeeper, Inc. v. U. S. Army Corps of Engineers, 781 F.3d 1271, 1279 (11th Cir. 2015). The St. Johns Riverkeeper affidavits submitted herein satisfy these requirements. Id.; Ouachita Watch League v. Jacobs, 463 F.3d 1163, 1170 (11th Cir. 2006).

Furthermore, the injuries alleged by the St. Johns Riverkeeper are in the nature of protecting the human environment, which is within the zone of interest that are protected by NEPA. Ouachita at 1173. *See also,* Catron County Bd. of Comm'rs v. United States Fish and Wildlife Service, 75 F.3d 1429, 1433 (10th Cir. 1996) (claims of flood damage were perceptible and environmental and fell within the zone of interest protected by NEPA).

Riverkeeper affidavits also demonstrate that it has organizational standing because its members otherwise have standing in their own right,  the interests sought to be protected are germane to the organization's purpose and neither the claims and relief requested do not require participation of individual members in the lawsuit. Black Warrior Riverkeeper, Inc. v. U. S. Army Corps of Engineers, 781 F.3d 1271, 1279 (11th Cir. 2015). Accordingly, the St. Johns Riverkeeper has standing to bring this action.

**WHEREFORE,** the St. Johns Riverkeeper respectfully requests that this court declare that the Corps has violated NEPA and enter a preliminary injunction prohibiting JaxPort and the Army Corps of Engineers from proceeding with dredging any portion of the St. Johns River, until such time as NEPA compliance is achieved by preparing the proper EIS for the 11 mile dredge, and an SEIS for the flooding impacts of dredging in light of the new information from Hurricane Irma.

Bledsoe Jacobson Schmidt Wright & Sussman

*/s/ Kenneth B. Wright*
_____
Kenneth B. Wright, Esquire
Florida Bar No.:  0893791
501 Riverside Avenue, Suite 903
Jacksonville, FL  32202
Telephone:  904-398-1818
Facsimile:  904-398-7073
Service:  service@jacobsonwright.com
Email:  Ken@jacobsonwright.com
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of December, 2017, the undersigned filed the above document which will be served via the CM/ECF system on the following:  Stephen Finn, Esquire, Army Corps of Engineers, stephen.finn@usdoj.gov, efile_nrs.enrd@usdoj.gov.

*/s/ Kenneth B. Wright*
_____
Kenneth B. Wright, Esquire