ST. JOHNS RIVERKEEPER, INC.,

        Plaintiff,

                                Case No. 3:17-cv-398-J-34MCR

vs.

UNITED STATES ARMY CORPS OF
ENGINEERS,

        Defendant,

vs.

JACKSONVILLE PORT AUTHORITY,

        Intervenor Defendant.

_____/

# O R D E R

**THIS CAUSE** is before the Court on Plaintiff's Motion for Preliminary Injunction and Memorandum of Law (Doc. 24; Riverkeeper Motion), filed on December 4, 2017, and Federal Defendant's Motion to Dismiss Counts I and II of Plaintiff's First Amended Complaint (Doc. 32; Corps Motion), filed on December 8, 2017. In the Riverkeeper Motion, Plaintiff St. Johns Riverkeeper, Inc. (Riverkeeper) seeks a preliminary injunction prohibiting Defendants from proceeding with a plan to dredge a portion of the St. Johns River until Defendant United States Army Corps of Engineers (Corps) "has satisfied its [National Environmental Policy Act (NEPA)] obligations." See Motion at 1, 25. As directed by the Court, see Order (Doc. 28), Riverkeeper filed a supplement in support of its Motion on December 8, 2017. See Plaintiff's Supplement on Security Requirements in Support of its Motion for Preliminary Injunction (Doc. 30; Supplement). The Corps and Intervenor

Defendant Jacksonville Port Authority (JaxPort) filed responses in opposition to the Riverkeeper Motion on December 14, 2017. See JaxPort's Memorandum of Law in Opposition to Riverkeeper's Motion for Preliminary Injunction (Doc. 33; JaxPort Response); Federal Defendant's Response to Plaintiff's Motion for Preliminary Injunction (Doc. 34; Corps Response). Riverkeeper filed a reply in support of its Motion on December 20, 2017. See Plaintiff's Reply to Defendants' Response to Plaintiff's Motion for Preliminary Injunction (Doc. 35; Reply).

In the Corps Motion, the Corps moves to dismiss Counts I and II of the First Amended Complaint for Declaratory and Injunctive Relief (Doc. 23; Amended Complaint). In doing so, the Corps contends that the Court lacks subject matter jurisdiction over Counts I and II. Riverkeeper responded to the Corps Motion on December 22, 2017. See Plaintiff St. Johns Riverkeeper's Response to Defendant United States Army Corps of Engineers' Motion to Dismiss Counts I and II of Plaintiff's First Amended Complaint (Doc. 36; Riverkeeper Response). The Court heard argument on the Riverkeeper Motion and the Corps Motion at a hearing on January 4, 2018. See Minute Entry (Doc. 37). Accordingly, the Motions are ripe for review.

## I. Introduction

Plaintiff, St. Johns Riverkeeper, Inc., is a nonprofit organization "dedicated to the protection, preservation, and restoration of the ecological integrity of the St. Johns River watershed for current users and future generations." See Riverkeeper Motion, Ex. B: Affidavit of Lisa Rinaman (Doc. 24-2; Rinaman Aff.) ¶ 3. Riverkeeper "monitors the environmental quality of the St. Johns River and its tributaries and advocates for its protection and restoration." Id. ¶ 4. One of the ways Riverkeeper works to protect and

restore the St. Johns River is by ensuring that environmental laws are properly followed in connection with the River.  Id.  Riverkeeper also works to educate the public about the St. Johns River and its management by organizing boat trips for its members and others.  Id. ¶ 5.  The Jacksonville Port Authority joined this action as an Intervenor Defendant on July 10, 2017.  See Order (Doc. 12).  JaxPort "was created by legislation in 1963 to own and operate marine facilities in Duval County, Florida."  See JaxPort's Answer to the First Amended Complaint and Affirmative Defenses (Doc. 31) at 1 n.1.  Pursuant to the JaxPort Charter, JaxPort is now a political body of the City of Jacksonville.  Id.

The Corps, in coordination with JaxPort, is currently proceeding with a plan to dredge a portion of the Jacksonville Harbor in the St. Johns River.  As required by law, the Corps studied the environmental impacts of a deepening project and in April 2014 issued an environmental impact statement on the project.  See April 2014 General Reevaluation Report II and Supplemental Environmental Impact Statement (A.R. at 298856; April 2014 Report).[1]  The United States Congress authorized construction of the dredging project in 2014.  Recently, JaxPort allocated funds to begin the dredging project and the federal government has appropriated funding for a portion of the project as well.  The Corps is prepared to begin dredging within weeks, if not days.

Riverkeeper initiated this action challenging the dredging project on April 7, 2017. See Complaint for Declaratory and Injunctive Relief (Doc. 1; Initial Complaint).  In the Initial Complaint, Riverkeeper asserted six causes of action all of which challenged the sufficiency of the Corps' compliance with the requirements of the National Environmental

---

[1] The public can access the April 2014 General Reevaluation Report II and Supplemental Environmental Impact Statement at: http://cdm16021.contentdm.oclc.org/cdm/ref/collection/p16021coll7/id/2118.

Policy Act (NEPA) in connection with the dredging project and the April 2014 Report on that project. Specifically, Riverkeeper challenged the Corps' study of the proposed project's environmental impacts, the adequacy of its mitigation plan, and the economic analysis of the project's costs and benefits. The Riverkeeper also alleged that the Corps failed to adequately provide for public participation, and failed to prepare a supplemental environmental impact statement to address compliance with state water quality standards for turbidity. Riverkeeper did not request preliminary injunctive relief at the time of filing the Complaint. The Court held a status conference to discuss an appropriate schedule for this action on August 1, 2017. <u>See</u> Minute Entry (Doc. 18). Neither before nor during the status conference did Riverkeeper suggest any intention to seek an order prohibiting the start of dredging before the Court resolved the merits of its claims.

On November 9, 2017, with leave of Court, Riverkeeper filed the Amended Complaint, which is the operative pleading before the Court. In the eight-count Amended Complaint, Riverkeeper continues to allege that the Corps failed to comply with the requirements of NEPA. In addition to the six areas of deficiency identified in the Initial Complaint, in the Amended Complaint, Riverkeeper has added two new claims in Counts I and II. In Count I, Riverkeeper alleges that the Corps has failed to prepare an environmental impact statement for the project it actually intends to complete, an 11-mile dredge. As such, Riverkeeper contends that the Corps must prepare an environmental impact study on the 11-mile project before it may commence with the dredging project. In Count II, Riverkeeper maintains that the Corps has failed to prepare a supplemental environmental impact statement addressing new information stemming from Hurricane Irma.

Approximately one month after filing the Amended Complaint, Riverkeeper filed its motion seeking a limited injunction prohibiting the Corps from beginning any dredging until the Court resolves the merits of two of its claims. In doing so, Riverkeeper relies not on the alleged NEPA violations identified in the Initial Complaint, the deficiencies in the April 2014 Report, but instead argues that an injunction is warranted based solely on the new claims asserted in Counts I and II of the Amended Complaint. Thus, for purposes of resolving the instant Motions, only the claims in Counts I and II are presently before the Court. What is not before the Court at this time are Riverkeeper's challenges to the overall sufficiency of the April 2014 Report which formed the basis of the approval of the 13-mile dredging project. As such, the resolution of the instant Motions does not reflect on the merits of those claims or whether Riverkeeper will ultimately prevail on its contention that the April 2014 Report is deficient.

## II. Applicable Law

### A. NEPA

#### i. Purpose

The purpose of NEPA, the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., is to protect and promote environmental quality. See N. Buckhead Civic Ass'n v. Skinner, 903 F.2d 1533, 1540 (11th Cir. 1990). To achieve this goal, "NEPA establishes procedures that a federal agency must follow before taking any action." Sierra Club v. Van Antwerp, 526 F.3d 1353, 1360 (11th Cir. 2008). These procedures require an agency "to document the potential environmental impacts of significant decisions before they are made." See Wilderness Watch & Public Emps. For Envtl. Responsibility v. Mainella, 375 F.3d 1085, 1094 (11th Cir. 2004). In this way, NEPA aims to: "(1) ensur[e] that agency

attention will be focused on the probable environmental consequences of [a] proposed action and (2) assur[e] the public that the agency has considered environmental concerns in its decision making process." See N. Buckhead Civic Ass'n, 903 F.2d at 1540; Mainella, 375 F.3d at 1094 (explaining that NEPA requires agencies to document environmental impacts to ensure that "environmental issues are considered by the agency and that important information is made available to the larger audience that may help to make the decision or will be affected by it").  As the Supreme Court explained in Marsh:

> NEPA promotes its sweeping commitment to 'prevent or eliminate damage to the environment and biosphere' by focusing Government and public attention on the environmental effects of proposed agency action.  42 U.S.C. § 4321.  By so focusing agency attention, NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct.

See Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 371 (1989).  No doubt, early consideration of environmental impacts allows "the public and other government agencies to react to the effects of a proposed action at a meaningful time."  Id.

However, NEPA does not mandate that agencies achieve "particular substantive environmental results."  See id. (emphasis added).  Unlike other statutes which may impose substantive environmental obligations on federal agencies, "NEPA merely prohibits uninformed—rather than unwise—agency action."  Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 351 (1989).  Thus, "'[i]f the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs.'"  Van Antwerp, 526 F.3d at 1360 (quoting Robertson, 490 U.S. at 350); see also id. at 1361 ("[W]hether the federal agency ends up taking the 'major Federal action' at issue has nothing to do with NEPA compliance; NEPA only requires that the agency follow a certain process in deciding

whether to take the action."); N. Buckhead Civic Ass'n, 903 F.2d at 1540-41. As such, the role of a reviewing court is to determine whether the agency "has satisfied the requirements of NEPA by taking a 'hard look' at the environmental consequences of its actions, the court cannot interfere with the agency decision made within its statutory discretion." See S. La. Envmtl. Council, Inc. v. Sand, 629 F.2d 1005, 1011 (5th Cir. 1980);[2] see also Mainella, 375 F.3d at 1094 ("[S]o long as an agency has taken a 'hard look' at the environmental consequences, a reviewing court may not impose its preferred outcome on the agency.").

### ii. Procedures

Before taking any action, NEPA requires an agency to first "determine whether the action to be taken constitutes a 'major Federal action'—that is, an action 'significantly affecting the quality of the human environment.'" See Van Antwerp, 526 F.3d at 1360 (quoting 42 U.S.C. § 4332(C)); see also 40 C.F.R. § 1508.18 (defining "major Federal action").[3] To make this determination, an agency must prepare an environmental assessment (EA). See Sierra Club v. U.S. Army Corps of Eng'rs (Suncoast Pkwy Case), 295 F.3d 1209, 1215 (11th Cir. 2002); see also 33 C.F.R. § 230.10 (Corps regulation on Environmental Assessments). "The EA should provide enough evidence and analysis to guide the agency to one of two conclusions: (1) a finding that the project will have a significant effect, or (2) a finding of no significant impact," commonly referred to as a

---

[2] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[3] The Council on Environmental Quality (CEQ) promulgated regulations to implement NEPA. See N. Buckhead Civic Ass'n, 903 F.2d at 1541. The CEQ regulations are entitled to substantial deference. See Marsh, 490 U.S. at 372. The relevant CEQ regulation defines "[m]ajor Federal action" to include "actions with effects that may be major and which are potentially subject to Federal control and responsibility. Major reinforces but does not have a meaning independent of significantly (§1508.27). . . . (a) Actions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies . . . ." See 40 C.F.R. §1508.18.

"FONSI." Suncoast Pkwy. Case, 295 F.3d at 1215; see also Dep't of Transp. v. Public Citizen, 541 U.S. 752, 757 (2004) ("The EA is to be a 'concise public document' that '[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS].'" (quoting 40 C.F.R. § 1508.9(a))). If the agency determines that the action will have no significant impact, it "issues a FONSI, which incorporates the EA and explains why the action will not have a significant effect on the human environment." Suncoast Pkwy. Case, 295 F.3d at 1215 (citing 40 C.F.R. § 1508.13); see also 33 C.F.R. § 230.11 (Corps regulation governing a FONSI).

However, if an agency determines in the EA that an action will have a significant effect, then the project is "major," and "the agency must prepare an environmental impact statement ('EIS'), as described in 42 U.S.C. § 4332(2)(C)." Suncoast Pkwy. Case, 295 F.3d at 1215; see also Antwerp, 526 F.3d at 1360; 33 C.F.R. § 230.6 (Corps regulation on actions normally requiring an EIS). The EIS is considered the "heart of NEPA." See Public Citizen, 541 U.S. at 757. Specifically, NEPA mandates that "in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment," a federal agency must prepare and include a "detailed statement" on:

(i)     the environmental impact of the proposed action,
(ii)    any adverse environmental effects which cannot be avoided should the proposal be implemented,
(iii)   alternatives to the proposed action,
(iv)    the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
(v)     any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

See 42 U.S.C. § 4332(2)(C)(i)-(v).  According to the CEQ regulations governing the preparation of an EIS, the statement must provide a "'full and fair discussion of significant environmental impacts.'"  See Suncoast Pkwy. Case, 295 F.3d at 1215 (quoting 40 C.F.R. § 1502.1); see also 33 C.F.R. § 230.13 (Corps regulation governing the EIS).  While these "action-forcing" procedures require agencies to "take a 'hard look' at environmental consequences," they do not "mandate particular results."  See Robertson, 490 U.S. at 350 (quoting Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21 (1976)).

The preparation of the EA and subsequent issuance of a FONSI or an EIS, however, is not the end of an agency's obligations under NEPA.  "In some cases, after an agency publishes a FONSI or an EIS, but before any action is taken, the proposed action changes, or the agency receives additional information."  Van Antwerp, 526 F.3d at 1360.  Under those circumstances, the agency must "make an additional NEPA determination."  Id.  The agency once again must take a "hard look" and determine "whether the changes create, or the information reveals, significant effects on the quality of the human environment not previously considered."  Id.; see Marsh, 490 U.S. at 385 ("[R]egardless of its eventual assessment of the significance of this information, the Corps had a duty to take a hard look at the proffered evidence.").  Significantly, "an agency need not supplement an EIS every time new information comes to light after the EIS is finalized."  See Marsh, 490 U.S. at 373.  Such a requirement would "render decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made."  Id.  Thus, it is only where "new, significant effects are shown," that an agency must prepare a supplemental environmental impact statement (SEIS).  Van Antwerp, 526 F.3d at 1360.

The Eleventh Circuit summarizes the duty to supplement as follows:

> [i]f, after the original EIS is prepared, the agency 'makes substantial changes in the proposed action that are relevant to environmental concerns,' or if there are 'significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts,' the agency is required to prepare a supplemental environmental impact statement (SEIS).

Suncoast Pkwy. Case, 295 F.3d at 1215 (quoting 40 C.F.R. § 1502.9(c)(1)). As such, "[t]he standard for determining when an SEIS is required is 'essentially the same' as the standard for determining when an EIS is required." Id. at 1215-16 (quoting Envtl. Def. Fund v. Marsh, 651 F.2d 983, 991 (5th Cir. Unit A July 1981)); see also Marsh, 490 U.S. at 374. A supplement is necessary "if the new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered . . ." by the federal agency. See Marsh, 490 U.S. at 374 (quoting 42 U.S.C. § 4332(2)(C)); see also Suncoast Pkwy. Case, 295 F.3d at 1216.

## B. Administrative Procedure Act (APA)

"Because NEPA does not provide for a private right of action, plaintiffs challenging an agency action based on NEPA must do so under the Administrative Procedure Act." Ouachita Watch League v. Jacobs, 463 F.3d 1163, 1173 (11th Cir. 2006) (internal quotation omitted); see Van Antwerp, 526 F.3d at 1359-60; Suncoast Pkwy. Case, 295 F.3d at 1216. The APA authorizes judicial review of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court . . . ." See 5 U.S.C. § 704. Significantly, § 704 provides that "[a] preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action." Id. As such, a court lacks jurisdiction to review agency action "when the administrative action in question is not 'final' within the meaning of 5

U.S.C. § 704."  See Nat'l Parks Conservation Ass'n v. Norton (Stiltsville Case), 324 F.3d 1229, 1236 (11th Cir. 2003).

The Supreme Court addressed the contours of "final agency action" in Bennett v. Spear, and instructed that:

> As a general matter, two conditions must be satisfied for agency action to be "final": First, the action must mark the "consummation" of the agency's decisionmaking process,—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow."

Bennett, 520 U.S. 154, 177-78 (1997) (internal citations omitted) (quoting Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 113 (1948) and Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic, 400 U.S. 62, 71 (1970)).  In contrast, a non-final agency action is one that "'does not itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action.'"  Stiltsville Case, 324 F.3d at 1237 (quoting Am. Airlines, Inc. v. Herman, 176 F.3d 283, 288 (5th Cir. 1999)).

While final agency action is reviewable under the APA, an agency's "failure to act" is sometimes, but not always, remediable under the APA.  See Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 61 (2004).  The provision of the APA governing failures to act is § 706(1), which provides that a "reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed."  See 5 U.S.C. § 706(1); see also Norton, 542 U.S. at 62.  Indeed, "an administrative agency cannot legitimately evade judicial review forever by continually postponing any consequence-laden action and then challenging federal jurisdiction on 'final agency action' grounds."  See Stiltsville Case, 324 F.3d at 1239. However, "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency

failed to take a <u>discrete</u> agency action that it is <u>required to take</u>." <u>Norton</u>, 542 U.S. at 64. The APA "empowers a court only to compel an agency 'to perform a ministerial or non-discretionary act,' or 'to take action upon a matter, without directing <u>how</u> it shall act.'" <u>Id.</u> (citation omitted). "Thus, when an agency is compelled by law to act within a certain time period, but the manner of its action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the action must be." <u>Id.</u> at 65.

In reviewing a final agency action, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law [or found to be] without observance of procedure required by law.'" <u>See</u> <u>Van Antwerp</u>, 526 F.3d at 1360 (alteration in original) (quoting 5 U.S.C. § 706(2)); <u>see also</u> <u>Suncoast Pkwy. Case</u>, 295 F.3d at 1216 ("Challenges brought under [NEPA] are reviewed by the arbitrary and capricious standard, as defined by the [APA]."). The Eleventh Circuit has instructed that this standard of review is an "'exceedingly deferential'" standard and the court's only role is to "ensure that the agency came to a rational conclusion, 'not to conduct its own investigation and substitute its own judgment for the administrative agency's decision.'" <u>See</u> <u>Van Antwerp</u>, 526 F.3d at 1360 (quoting <u>Fund for Animals, Inc. v. Rice</u>, 85 F.3d 535, 541 (11th Cir. 1996) and <u>Preserve Endangered Areas of Cobb's History, Inc. ("PEACH") v. U.S. Army Corps of Eng'rs</u>, 87 F.3d 1242, 1246 (11th Cir. 1996)). Nonetheless, in the context of a NEPA challenge the court must "look beyond the scope of the decision itself to the relevant factors that the agency considered" and "ensure that the agency took a 'hard look' at the environmental consequences of the proposed action." <u>See</u> <u>Suncoast Pkwy. Case</u>, 295 F.3d at 1216; <u>see also</u> <u>Marsh</u>, 490 U.S. at 378 (explaining that while the arbitrary and capricious inquiry "must

be searching and careful," the "ultimate standard of review is a narrow one" (internal quotations omitted)). As such, the court must consider "not only the final documents prepared by the agency, but also the entire administrative record." Suncoast Pkwy. Case, 295 F.3d at 1216.

In the Suncoast Parkway Case, the Eleventh Circuit elaborated on the "hard look" requirement as follows:

> An agency has met its "hard look" requirement if it has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." The court will overturn an agency's decision as arbitrary and capricious under "hard look" review if it suffers from one of the following: (1) the decision does not rely on the factors that Congress intended the agency to consider; (2) the agency failed entirely to consider an important aspect of the problem; (3) the agency offers an explanation which runs counter to the evidence; (4) the decision is so implausible that it cannot be the result of differing viewpoints or the result of agency expertise.

Id. at 1216 (internal citation omitted) (alterations in original) (quoting Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)). Notably, "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." See Marsh, 490 U.S. at 378.

Courts also apply the arbitrary and capricious standard when reviewing an agency's decision not to prepare an SEIS. See id. at 377-78. As above, "the reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" Id. at 378 (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971)). Significantly, in this context, "courts should not automatically defer to the agency's express reliance on an interest in finality without carefully reviewing the record and satisfying themselves that the agency has made

a reasoned decision based on its evaluation of the significance-or lack of significance-of the new information." Id. Ultimately, the challenging party bears the burden of showing by a preponderance of the evidence that the agency failed to comply with NEPA's procedural requirements. See Citizens for Smart Growth v. Sec'y of Dep't of Transp., 669 F.3d 1203, 1211 (11th Cir. 2012).

## III. Factual Background

The "Jacksonville Harbor consists of 20 river miles starting at the mouth of the St. Johns River where it empties into the Atlantic Ocean." See April 2014 Report at i. Pursuant to a long-standing resolution from the Committee on Public Works and Transportation, United States House of Representatives, the Corps has undertaken numerous studies of navigation improvements to the Jacksonville Harbor. See April 2014 Report at 1. As relevant to this action, in the April 2014 Report, the Corps examined whether navigation improvements to the Jacksonville Harbor, including widening and deepening the Harbor, "are warranted and in the Federal interest." Id. at iii. Ultimately, the Corps determined that "[t]here is an opportunity to improve navigation at Jacksonville Harbor by reducing transportation costs for larger ships forecast to call at Jacksonville Harbor." Id. at iii. Notably, the St. Johns River has been the subject of deepening projects in the past. Specifically, in the 1999 Water Resource Development Act, Congress authorized deepening the Jacksonville Harbor to River Mile 14.7, from 38 feet to 40 feet, and construction was completed in 2003. See id. at iii. The Corps later recommended deepening the Jacksonville Harbor from River Mile 14.7 to River Mile 20, from 38 feet to 40 feet. Id. Congress authorized that project in the FY2006 Appropriations Act and construction was completed in 2010. Id.

On April 13, 2007, the Corps published in the Federal Register a "Notice of Intent" to prepare a supplemental environmental impact statement on an additional deepening project. Id. at 265. After years of study, public workshops, and public meetings, the Corps issued a draft report for public comment on May 31, 2013. Id. at 265-66. All analyses, including modeling, were completed and available to the public via the study website by September 30, 2013. Id. at 266. The Corps provided a comment period, beginning May 31, 2013, which it extended through October 24, 2013, "in order to provide stakeholders an opportunity to review and comment on all completed analyses and modeling." Id. At the conclusion of this seven year process, the Corps issued the Final Integrated General Reevaluation Report II and Supplemental Environmental Impact Statement in April 2014, which the Court refers to in this Order as the April 2014 Report.

In its April 2014 Report, the Corps evaluated various deepening and widening alternatives, turning basins, nonstructural alternatives, as well as the alternative of taking no action. Id. at iv. Ultimately, the Corps concluded that:

> The recommended plan is the locally preferred plan (LPP), **which includes deepening the Federal channel to 47 feet from the entrance channel to approximately River Mile 13**; two areas of widening at the Training Wall Reach and St. Johns Bluff Reach; and two new Turning Basins at Blount Island and Brills Cut.

See April 2014 Report at i. (emphasis added). Congress authorized construction of the recommended plan in section 7002(1) of the Water Resources and Development Act of 2014. See Corps Response, Ex. 1: Declaration of Jason S. Harrah (Doc. 34-1; Harrah Decl.) ¶ 3. The Assistant Secretary of the Army (Civil Works) signed the Record of Decision (ROD) on April 8, 2015. Id.

On January 31, 2017, the Corps and JaxPort executed the Project Partnership Agreement Between the Department of the Army and Jacksonville Port Authority for Construction of the Jacksonville Harbor Navigation Project (the PPA). See Harrah Decl. ¶ 6; Corps Response, Ex. 2. JaxPort, as the local sponsor for the project, is required to provide a substantial portion of the funding, see JaxPort Resp., Ex. 1: Affidavit of Eric B. Green (Doc. 33-1; Green Aff.) ¶ 5, but the Corps is responsible for constructing the project. Specifically, the PPA provides that the Corps will construct the "general navigation features," which the PPA defines in pertinent part as the "deepening of the existing 40-foot mean lower low water (MLLW) channel to 47 feet MLLW from the entrance channel to approximately River Mile (RM) 13 . . . ." See PPA art. I, B.; art. II, B. "The project will be advertised, awarded and constructed in four separate contracts (A through D)," in order to allow "maximum bidder competition and cost effectiveness for the project." Harrah Decl. ¶ 7. Contracts A-C will address the first 11 miles of the dredging project. Id. Contract A, which pertains to the deepening of River Miles 0 to 3, was awarded in September 2017. The work under Contract A which is "scheduled to commence on or before January 31, 2018," is the subject of the Riverkeeper Motion. Id.

### A. The 11-Mile Dredge

Although the PPA describes the project as the deepening of the channel from the entrance to River Mile 13, Riverkeeper maintains that JaxPort actually intends to stop the dredging project at River Mile 11. According to Riverkeeper, the difference between an 11-mile dredge and a 13-mile dredge is significant because it changes the economic analysis of the project. If the dredging is stopped at River Mile 11, then it will not reach the terminal operated by Mitsui OSK Lines with its trading partner TraPac (the MOL terminal).

The development of the MOL terminal "has brought major east-west global services to Jacksonville Harbor," whereas prior to its development "Jacksonville was primarily a regional container port for Puerto Rico and the Caribbean, with some limited service to South America." See April 2014 Report at 88. Notably, the MOL terminal currently is located near River Mile 11.5, on the west side of the Dames Point Bridge. Riverkeeper notes that the Dames Point Bridge creates air draft restrictions which limit the size of vessels able to pass under the Bridge. See Rinaman Aff., Att. 1 at 188. Thus, in Riverkeeper's view, although dredging the river is intended to allow larger vessels into the Harbor, the air draft restrictions presented by the Dames Point Bridge will nonetheless limit the size of the vessels able to reach the MOL terminal. See Amended Complaint ¶¶ 81-84.

Riverkeeper contends that despite seeking and obtaining approval for a 13-mile dredge, JaxPort actually intends to complete only 11 miles of the project. In support Riverkeeper notes that JaxPort is engaged in ongoing negotiations to move the MOL terminal to Blount Island, which is on the east side of the Dames Point Bridge, and would fall within the scope of an 11-mile dredge. See, e.g., Rinaman Aff., Att. 2. Significantly, the April 2014 Report does not contain a benefit-to-cost ratio of an 11-mile dredge project, which would include consideration of the economic and environmental effects of the shorter, 11-mile dredge along with the costs of moving the MOL terminal.

As evidence of JaxPort's intention to complete only this 11-mile dredge project, Riverkeeper submits a "Joint Statement of Intent," signed in May of 2017 by representatives from Jaxport, MOL/TraPac and SSA Cooper. See Rinaman Aff., Att. 4. The Joint Statement of Intent memorializes the mutual intention of these entities to

"develop Blount Island as a deep-water terminal and to maintain the Dames Point Marine Terminal at its existing channel depth." See id. This Statement further acknowledges that "the existing tenants at Dames Point and Blount Island may be repositioned, consistent with the highest and best use of Jaxport's port facilities." Id.

In addition, Riverkeeper submits the minutes of the June 26, 2017 JaxPort Board Meeting, and asserts that at this meeting "the JaxPort Board approved millions of dollars of expenditures for an 11 mile $484 million dredge." See Affidavit of Lisa Rinaman (Rinaman Aff.) ¶ 15, Ex. 3. However, JaxPort's CEO, Eric B. Green, explains that "JaxPort has focused on identifying the funding for the first three phases of the Project," but maintains that "the 13 mile scope of the Project has not changed." See Green Aff. ¶ 5. According to Green, "[u]nder the PPA, only the Corps is empowered to initiate and analyze any potential change in the scope of the Project," and the Corps "will charge the costs to analyze any such change as a cost of the Project." Id. ¶ 6.[4] Green states that "JaxPort has not requested the Corps to modify the scope of the Project, nor has the Corps sought funding from JaxPort to analyze any change in the scope of the Project." Id. ¶ 7. Notably, however, at the August 1, 2017 Status Conference before this Court, the following exchange took place:

> THE COURT: Well, what did they say in their answer? I mean, they've answered the complaint. I have the answer. Are they denying that they're proceeding on that project?
>
> MR. WRIGHT [Riverkeeper]: No, Your Honor. Not -- I mean, the [C]orps is saying that they're doing -- their project is 13 miles. My recollection from the

---

[4] Indeed, the PPA provides that:
> If the Government concludes there is a need to re-evaluate the Project to determine whether the full length of the channel to RM 13 should be deepened, such a re-evaluation of the Project will be accomplished at the direction of the Government, which may be by contract or using in-house resources, and the cost will be included in the total costs of construction of the general navigation features.

See PPA, art II., D.

answer of the -- of JaxPort, is that they say they're going to go for 11 miles, or at least that they've discussed it. I'm not sure. I'm happy to let Mr. Kise address it.

THE COURT: Go ahead, sir. Please.

MR. KISE [JaxPort]: I'll certainly try, Your Honor. Yes, I think that that has -- that is the current intent of JaxPort, but I think -- the 11 miles. I will say in terms of --

THE COURT: Sorry. Just to make sure I'm understanding. The current position of JaxPort is that you're only proceeding on dredging 11 of the 13 miles?

MR. KISE: Yes, Your Honor.

See Tr. of Aug. 1, 2017 Status Conference (Doc. 19; Tr.) at 17-18.[5]

The Corps does not deny that it has discussed shortening the project with JaxPort. Jason Harrah, the Corps' Senior Project Manager for the Jacksonville Harbor Navigation Project, explains that such discussions did take place as part of consultations with JaxPort on how to potentially improve the benefit-to-cost ratio "to make the project more competitive for future construction appropriations."  See Harrah Decl. ¶¶ 1, 5.  At JaxPort's request, the Corps has calculated the benefit-to-cost ratio for several hypothetical scenarios, including one with the Contract D portion of the project (deepening River Miles 11 to 13) eliminated. See id.  However, Harrah maintains that when the Corps performed these calculations, it informed JaxPort that "these scenarios were not in accordance with the authorized project and implementation of any changes would require a post-authorization change to the project."  Id.  Harrah asserts that any discussions regarding an 11-mile project "were very

---

[5] In its Answer to the Initial Complaint, JaxPort admitted that it "is considering cutting two miles off the length of the dredging which could eliminate dredging west of the Dames Point Bridge."  See JaxPort's Answer and Affirmative Defenses (Doc. 13) ¶ 62.

preliminary," and JaxPort "has not indicated a definitive intent to change the authorized project that the Corps is implementing with JaxPort." Id.

Most recently, at the October 23, 2017 JaxPort Board Meeting, Harrah reported to the JaxPort Board on the project. Riverkeeper attaches a transcript of this October 23, 2017 meeting to its Response. See Riverkeeper Response, Ex. A: Transcript of Board of Directors Meeting Presentation by Jason Harrah (Meeting Tr.). During his presentation, Harrah stated that "Contract D is not our area of focus right now" and "Contract D will be held, as we discussed. It's not the primary area of focus right now. We're focused on A, B, and C." See Meeting Tr. at 4-5. When asked by a board member specifically about Contract D, Harrah responded:

> Mr. Harrah: So, we have Contracts A, B, C, and D. Contract D exists at the MOL area. And we understand there is current discussions going on about moving the cargo that's in MOL to the Blount Island area. So, that area –
>
> Mr. Shelton: Dames—Dames Point.
>
> Mr. Harrah: -- could be removed as far as the construction contract.

Id. at 14. When Shelton sought further explanation regarding the "scope of the numbers" on an unidentified document, JaxPort CEO Eric Green interjected. Id. Green explained that the Board approved the PPA with the Corps for 13 miles, because "[w]e never wanted to eliminate the additional two miles because we didn't know what the future may hold," but the "sheet that you have" represents 11 miles. Id. at 14-15. Green explained "that's the work product that we've been working with with the Army Corps, which is the 11 miles, as Mr. Harrah alluded to with the moving of TraPac, MOL, over to Blount Island which, then, would change the –the project, itself, to 11-mile project." Id. at 15-16. Harrah then added that "the key is, that extra two miles will remain authorized until it would ever be de-

authorized.  So, it can be constructed at any time in the future." Id. at 16.  Board Member Newman then asked "what would be the commensurate savings if we go from 13 to 11?" to which Harrah responded "I know you guys have talked about numbers.  About 120 million is what we've assumed." Id.  As of this meeting, JaxPort and MOL were still in negotiations regarding moving the MOL terminal to Blount Island.  See Rinaman Aff. ¶ 18.

## B. Flooding

In the April 2014 Report, the Corps analyzed the impact that the proposed dredging project would have on tide and storm surge water levels.  See April 2014 Report at 173, App. A at A-6; see also id., App. A, Attach. J.  To conduct this analysis, the Corps modeled the maximum water surface elevation in the Jacksonville Harbor during hypothetical 50- and 100-year storm events in combination with different scenarios of sea level rise.  See id., App. A, Attach. J, Table 2.1.  To "calibrate and verify" its modeling of the storm event scenarios, the Corps used data from two storm events, Hurricane Dora and Hurricane Frances.  See id., App. A at A-6; see also id., App. A, Att. J, App. D at 6.  The Corps ran these models at the Jacksonville Harbor's existing depth and with the proposed 47-ft depth. The Corps then compared the difference in maximum water surface elevations between the two depths under the various storm and sea level rise scenarios.  Id.  This difference showed the impact the dredging project would have on storm surge water surface elevations.  See id., App. A, Att. J at 23, Table 3.1.  Based on this comparison, the Corps determined that:

> The model results indicate the 47-ft. channel configuration scenario produces only slightly elevated peak water levels as compared to the baseline channel configuration and negligible changes in pre-storm tides. The largest difference in maximum Water Surface Elevation of 0.3 ft, between the without project depths and the 47-ft project depths, occurs for the 0.4 ft sea level rise and 50-year storm event.

See id., App. A at A-6, Attach. J at 27.  The Corps also ran its model using a simulation of Hurricane Dora under existing and post-dredging conditions, without including sea level rise.  The Corps found that "simulations of Hurricane Dora for existing and post-dredging conditions did not yield differences in peak surge, timing of the peak surge, or inundation [flood] area; therefore, peak surge (for storm tracks and characteristics similar to Hurricane Dora) does not show a sensitivity to changes in Jacksonville Harbor channel depth."  See id., App. A, Attach. J at 24.

Hurricane Irma hit the Jacksonville area on September 10-11, 2017, immediately following a nor'easter, and caused historic flooding in the Jacksonville Harbor Navigation Project area.  See Riverkeeper Motion, Ex. A: Affidavit of Dr. Jeremy Stalker (Doc. 24-1; Stalker Aff.) ¶ 16; Corps Response, Ex. 4: Declaration of Jason J. Spinning (Doc. 34-4; Spinning Decl.) ¶ 2.  On September 19, 2017, the Corps awarded the first of the four deepening contracts, Contract A.  See Harrah Aff. ¶ 8.  Riverkeeper first challenged the Corps' failure to consider Hurricane Irma as new information relevant to the project in its Amended Complaint, filed on November 9, 2017.  See Amended Complaint at 10-12, 27-28.  Indeed, at the January 4, 2018 Hearing, Riverkeeper conceded that it had not previously raised the possibility of Hurricane Irma constituting new information with the Corps.  On November 30, 2017, the Corps issued a letter stating:

> Concurrent with preparation of NEPA documentation on the berthing area improvements, to further the purposes of NEPA, the Corps will also consider whether the recent flooding conditions in the vicinity of the Jacksonville Harbor Navigation Project following the 2017 nor'easter and Hurricane Irma constitute significant new circumstances or information relevant to environmental concerns and bearing on the Jacksonville Harbor Navigation Project or its impacts.

See Rinaman Aff., Attach. 5. Then, on December 4, 2017, Riverkeeper filed the instant Motion seeking to halt the start of the dredge project until the Court resolved the merits of its claims regarding the 11-mile dredge and the need for a supplement to the April 2014 Report in light of Hurricane Irma. Riverkeeper attached to its Motion the Affidavit of Dr. Jeremy Stalker, an associate professor of biology and marine sciences, with a PhD in geological earth sciences.[6] See Stalker Aff. ¶¶ 4, 8. In his Affidavit, Stalker states that "Irma flooding represents the most recent and most detailed information available related to flooding and should be taken into account in any modeling intended to gauge the potential extent of flooding increases from dredging the St. Johns River." Id. ¶¶ 16-17. Stalker opines that the Corps' modeling suffers from significant deficiencies such that it is inaccurate in its ability to predict flooding. Id. ¶¶ 20-22. Moreover, according to Stalker, "[i]f the Corps model was run with data from Irma, even with its deficiencies, it is likely that it would predict that still greater flooding would be caused by the dredging—although some of the deficiencies will likely obscure and minimize the full effects." Id. ¶ 19.

In its Response to the Riverkeeper Motion filed on December 14, 2017, the Corps attached a Draft Supplemental Environmental Assessment (Draft EA) and Draft Finding of No Significant Impact (Draft FONSI). See Corps Response, Ex. 4: Declaration of Jason J. Spinning (Spinning Decl.) ¶ 3, Attach. A. In the Draft EA, the Corps reviewed recent storm events and flooding in the vicinity of the Jacksonville Harbor Navigation Project. See generally id. The Corps concluded in the Draft FONSI that "these events do not constitute significant new circumstances or information relevant to environmental concerns and bearing on the project or its impacts." See Draft FONSI at 1. The Corps released the Draft

---

[6] Stalker notes that he worked as a hydrologist for the United States Geological Survey from 2000 to 2001 and that he studied groundwater modeling in his "undergraduate and graduate coursework." Id. ¶¶ 7, 9.

EA and Draft FONSI to the public on December 14, 2017.  See Spinning Decl. ¶ 3.  At the January 4, 2017 Hearing, the Corps informed the Court that the Draft EA and Draft FONSI had been finalized, and the Court accepted into evidence, with Riverkeeper's agreement, the Supplemental Environmental Assessment (SEA) and Finding of No Significant Impact (FONSI).  See Minute Entry (Doc. 37), Fed. Def.'s Ex. 1: SEA and FONSI.

In the SEA, the Corps "considered the recent storm events and flooding in the vicinity of the Jacksonville Harbor Navigation Project following the 2017 nor'easter and Hurricane Irma."  See FONSI at 1.  The Corps compared the maximum water surface elevations from recent storms, including Irma, with the data used in the storm surge analysis contained in the April 2014 Report.  The Corps determined that it had previously "modeled events comparable to or more severe than Hurricane Irma."  See SEA at 13.  Specifically, the Corps modeled a hypothetical 50-year storm event with maximum water levels that exceeded the high water marks that occurred during Hurricane Irma.  See id. at 13-14.  For example, the Corps modeled a 50-year storm with a maximum water surface elevation of 8.01 feet at Mayport, 6.57 feet at Dames Point, and 7.59 feet at San Marco.  Id. at 13-14, Table 2.  The water level measurements and high water marks that occurred for Hurricanes Dora, Matthew, and Irma ranged from 5 feet at Mayport, 5-6.5 feet at Dames Point, and 5-5.7 feet at San Marco, all lower than the maximum water surface elevation utilized by the Corps in its model.  Id. at 13.  As such, the Corps states in the FONSI that it has determined that the recent storm events and flooding following the 2017 nor'easter and Hurricane Irma "do not constitute significant new circumstances or information relevant to environmental concerns and bearing on the project or its impacts."  See FONSI at 1.

## IV. Standards of Review

### A. Preliminary Injunction Standard

In the Riverkeeper Motion, Riverkeeper, citing to NEPA, seeks a preliminary injunction prohibiting the start of any portion of the dredge project until the Court has resolved its challenge to the Corps' failure to prepare an EIS with respect to the 11-mile dredge and its claim that the Corps must prepare an SEIS to evaluate new information stemming from Hurricane Irma. A preliminary injunction is an extraordinary and drastic remedy. See McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998); see also Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right."); Davidoff & CIE, S.A. v. PLD Int'l Corp., 263 F.3d 1297, 1300 (11th Cir. 2001). Indeed, "[a] preliminary injunction is a powerful exercise of judicial authority in advance of trial." Ne. Fla. Chapter of Ass'n of Gen Contractors of Am. v. City of Jacksonville, 896 F.2d 1283, 1284 (11th Cir. 1990). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." Winter, 555 U.S. at 20; see also Am. Red Cross v. Palm Beach Blood Bank, Inc., 143 F.3d 1407, 1410 (11th Cir. 1998) ("In order to secure a preliminary injunction, a plaintiff must show (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction were not granted, (3) that the threatened injury to the plaintiff outweighs the harm an injunction may cause the defendant, and (4) that granting the injunction would not disserve the public interest."); Davidoff & CIE, S.A., 263 F.3d at 1300; McDonald's Corp., 147 F.3d at 1306; Ne. Fla., 896 F.2d at 1284-85. The movant, at

all times, bears the burden of persuasion as to each of these four requirements.  See Ne.

Fla., 896 F.2d at 1285.  The failure to establish an element, such as a substantial likelihood

of success on the merits, will warrant denial of the request for preliminary injunctive relief

and obviate the need to discuss the remaining elements.[7]  See Pittman v. Cole, 267 F.3d

1269, 1292 (11th Cir. 2001) (citing Church v. City of Huntsville, 30 F.3d 1332, 1342 (11th

Cir. 1994)); Del Monte Fresh Produce Co. v. Dole Food Co., 148 F. Supp. 2d 1326, 1339

n.7 (S.D. Fla. 2001).

### B.  Motion to Dismiss Standard

In the Corps Motion, the Corps seeks dismissal of Counts I and II of the Amended

Complaint pursuant to Rule 12(b)(1), Federal Rules of Civil Procedure (Rule(s)) based on

its contention that the Court lacks subject-matter jurisdiction over these claims.  See

generally Motion to Dismiss.  Federal courts are courts of limited jurisdiction "'empowered

to hear only those cases within the judicial power of the United States as defined by Article

III of the Constitution,' and which have been entrusted to them by a jurisdictional grant

authorized by Congress."  See Univ. of S. Ala. v. Am. Tobacco Co., 168 F.3d 405, 409

(11th Cir. 1999) (quoting Taylor v. Appleton, 30 F.3d 1365, 1367 (11th Cir. 1994)).  Indeed,

jurisdiction is the power of the Court to declare the law.  Id. at 410.  "When a federal court

acts outside its statutory subject-matter jurisdiction, it violates the fundamental

constitutional precept of limited federal power."  Id. at 409 (internal quotation omitted).

Such action offends the "'principles of separation of powers.'"  Id. at 410 (quoting Steel Co.

v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998)).  As such, "[i]f the court determines

---

[7] Similarly, where a plaintiff fails to establish irreparable harm, the court need not address each element of a claim for preliminary injunctive relief.  See Ne. Fla., 896 F.2d at 1285 (noting that "[a] showing of irreparable harm is the sine qua non of injunctive relief" and reversing the grant of such relief absent irreparable harm).

at any time that it lacks subject-matter jurisdiction, it must dismiss" the claim. See Rule 12(h)(3); see also Univ. of S. Ala., 168 F.3d at 410 ("Simply put, once a federal court determines that it is without subject matter jurisdiction, the court is powerless to continue.").

The jurisdiction of the federal court may be attacked facially or factually. Morrison v. Amway Corp., 323 F.3d 920, 924 n.5 (11th Cir. 2003). In a facial challenge, a court assumes the allegations in the complaint are true and determines whether the complaint sufficiently alleges a basis for subject-matter jurisdiction. Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990). On the other hand, factual attacks "challenge the 'existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered.'" Id. (citation omitted). In considering a factual attack on subject-matter jurisdiction, the Court is free to weigh the facts and is not constrained to view them in the light most favorable to the plaintiff. Carmichael v. Kellogg, Brown & Root Servs., Inc., 572 F.3d 1271, 1279 (11th Cir. 2009), cert. denied, 130 S.Ct. 3499 (2010). "'The burden for establishing federal subject matter jurisdiction rests with the party bringing the claim.'" See Williams v. Poarch Band of Creek Indians, 839 F.3d 1312, 1314 (11th Cir. 2016) (quoting Sweet Pea Marine Ltd. V. APJ Marine, Inc., 411 F.3d 1242, 1247 (11th Cir. 2005)).

## V.    Discussion

In the Riverkeeper Motion, Riverkeeper seeks to "preserve the status quo" through an injunction prohibiting the Corps and JaxPort from "dredging any portion of the St. Johns River, until such time as NEPA compliance is achieved by preparing the proper EIS for the 11 mile dredge, and an SEIS for the flooding impacts of dredging in light of the new information from Hurricane Irma." See Motion at 1, 25. Riverkeeper maintains that an

injunction is warranted because the Corps has acted arbitrarily and capriciously in failing to conduct an EIS for the purported 11-mile dredge project. In addition, Riverkeeper argues that the Corps has acted arbitrarily and capriciously by failing to prepare an SEIS to address the allegedly new information presented by the flood levels following Hurricane Irma. The Corps and JaxPort maintain that the Court should deny the Riverkeeper Motion because, inter alia, Riverkeeper fails to satisfy its burden of establishing a substantial likelihood of success on its claims. Generally, JaxPort and the Corps argue that there is no final agency action with respect to an 11-mile dredge project, and as such, the Court lacks subject matter jurisdiction to review the Corps' actions with regard to the alleged 11-mile project. The Corps moves to dismiss Count I on this basis. In addition, JaxPort and the Corps assert that the Corps' decision not to prepare an SEIS subsequent to Hurricane Irma is not arbitrary and capricious because Hurricane Irma does not present new information not previously considered in the April 2014 Report. The Corps also moved to dismiss Count II for lack of subject matter jurisdiction, but as addressed below, those arguments were largely withdrawn following the issuance of the SEA and FONSI.

### A. Count I: The 11-Mile Dredge[8]

In Count I of the Amended Complaint, Riverkeeper alleges that JaxPort has decided to stop the dredging project at River Mile 11, rather than River Mile 13. See Amended Complaint ¶ 107. According to Riverkeeper, the Corps is aware of JaxPort's intentions but has "not prepared an EIS for the 11 mile dredge." See id. ¶ 109. Riverkeeper contends

---

[8] The Court notes that the Corps Motion makes a factual attack on this Court's subject matter jurisdiction in that the Corps has submitted evidence challenging this Court's subject matter jurisdiction irrespective of the pleadings. Specifically, the Corps contends that contrary to the allegations of the Amended Complaint, it has not made a final decision with respect to an 11-mile dredge project. Because the Corps makes a factual attack on this Court's subject matter jurisdiction, the Court may consider matters outside the pleadings, and indeed, the parties have submitted evidence on this issue. See Miccosukee Tribe of Indians of Fla. v. U.S. Envtl. Prot. Agency, 105 F.3d 599, 603 (11th Cir. 1997).

that "[]b]y proposing the use of federal funds without preparing an EIS, the Corps has acted in a manner that is not in accordance with law, in violation of NEPA and the APA 5 U.S.C. § 701." Id. ¶ 111. The Corps has prepared an EIS, the April 2014 Report, which analyzes the deepening of Jacksonville Harbor, however, this Report recommends a 13-mile dredge. See April 2014 Report at i. In Riverkeeper's view, JaxPort has decided to stop the dredging project at River Mile 11, and as such, Riverkeeper maintains that NEPA requires a new EIS for the purported 11-mile dredge project. Notably, Riverkeeper does not contend that the environmental impacts of an 11-mile dredge are different from those of the 13-mile dredge. Rather, Riverkeeper argues that shortening the dredge project to River Mile 11 affects the economic outlook for the project such that the Corps must prepare a new cost-benefit analysis before it starts to dredge. Upon review, for the reasons set forth below, the Court finds that Riverkeeper fails to establish a substantial likelihood of success on this claim. Specifically, Riverkeeper fails to present evidence of a final agency action to proceed with an 11-mile dredge project. Absent a final agency action, the Court lacks subject-matter jurisdiction over this claim and must grant the Corps Motion to dismiss as to Count I of the Amended Complaint.

Riverkeeper asserts that this Court has subject-matter jurisdiction for two reasons. First, Riverkeeper submits evidence which it contends establishes the existence of a final agency decision to proceed with an 11-mile dredge that is reviewable by the Court. See Riverkeeper Response at 8-9. In addition, Riverkeeper argues that regardless, this claim is based on a "failure to act" such that it is not required to show a final agency action. See id. at 7-8. The Court turns first to Riverkeeper's contention that the Corps has made a final decision to proceed with an 11-mile dredge. Based on the evidence set forth above,

Riverkeeper has established that JaxPort is actively working to negotiate a move of the MOL terminal to Blount Island, and if these negotiations prove successful, JaxPort will likely seek to stop the dredge at River Mile 11. JaxPort anticipates that it could save as much as $200 million by eliminating the last 2-mile portion of the dredging project. It is undisputed that the Corps is very aware of these negotiations as well as the likelihood that at some point in the future JaxPort may request that the Corps stop the dredging project at River Mile 11. Harrah's statements indicate that the Corps is amenable to undertaking the process to consider this change, at JaxPort's expense, if and when JaxPort makes such a request. Nonetheless, Riverkeeper's evidence stops well short of showing that the decision to make this change has actually occurred. The PPA provides for a 13-mile dredge, the ROD relates to a 13-mile dredge, and Congress has authorized a 13-mile dredge. The record is devoid of any documented agency decision to change the scope of this authorized project.

Instead, Riverkeeper identifies Harrah's statements at the October 23, 2017 Board Meeting as the "decision that is the agency action cognizable under the APA." See Riverkeeper Response at 9. In Bennett v. Spear, the Supreme Court explained that:

> two conditions must be satisfied for agency action to be 'final': First, the action must mark the "consummation" of the agency's decisionmaking process,--it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow."

See Bennett, 520 U.S. at 177-78 (internal quotations and citations omitted). Harrah's statements to the Board fall far short of establishing this level of finality. Harrah states that the Corps is not "focused" on Contract D, and recognizes that JaxPort is negotiating to move the MOL terminal such that Contract D "could be removed." See Meeting Tr. at 14.

But "could be" is not the same as "will be" or "has been."  Indeed, Green states at the Meeting that JaxPort has never asked to eliminate the final two miles because "we didn't know what the future may hold."  See id. at 15.  Another Board Member asks what the savings would be "if we go from 13 to 11."  Id. at 16 (emphasis added).  While it is evident that JaxPort is actively pursuing the possibility of stopping the dredge at River Mile 11, JaxPort has not made a final decision to forego the 13-mile dredge, much less asked the Corps to approve such a change.  JaxPort's discussions with the Corps of possibilities do not rise to the level of the "consummation" of the decisionmaking process.  Moreover, nothing in the statements on which Riverkeeper relies constitutes an action on which any "right or obligation" has been determined or from which "legal consequences flow."  See Bennett, 520 U.S. at 177-78.  None of these statements provide a basis for any party to assert a right to proceed with, or seek damages for not proceeding with, an 11-mile dredge. Notably, Riverkeeper has failed to identify any legal authority finding the existence of a final agency action under facts such as these.  As such, applying the Supreme Court's standard from Bennett, the Court determines that there is no "final agency action" with respect to an 11-mile dredge.  Absent such action, the Court is without jurisdiction to adjudicate Riverkeeper's claim in Count I.

Although not directly pled in the Amended Complaint, Riverkeeper argues that its claim is premised on a "failure to act" such that it need not show "final agency action."  This contention is likewise unavailing.  With respect to its failure to act claim, Riverkeeper must allege that the Corps "failed to take a discrete agency action that it was required to take." Norton, 542 U.S. at 64.  Here, the purported "failure to act" is the failure to prepare an EIS with respect to an 11-mile dredge.  However, until the agency makes a final decision to

pursue the 11-mile dredge, the Corps is not <u>required to act</u>, and any claim with respect to the absent EIS is premature.  <u>See</u> <u>Kleppe</u>, 427 U.S. at 405-06 ("[T]he moment at which an agency must have a final statement ready 'is the time at which it makes a recommendation or report on a proposal for federal action.'" (emphasis omitted) (quoting <u>Aberdeen & Rockfish R. Co. v. Students Challenging Regulatory Agency Procedures (S.C.R.A.P.)</u>, 422 U.S. 289, 320 (1975))).  In <u>Kleppe v. Sierra Club</u>, the Supreme Court explained that

> the time at which a court enters the process is when the report or recommendation on the proposal is made, and someone protests either the absence or the adequacy of the final impact statement.  This is the point at which the agency's action has reached sufficient maturity to assure that judicial intervention will not hazard unnecessary disruption.

<u>See</u> <u>id.</u> at 406 n.15.  In reaching this conclusion, the Court noted that allowing judicial intervention to require the preparation of an EIS where a project is merely being contemplated likely would result in the costly "preparation of a good many unnecessary impact statements."  <u>Id.</u> at 406.[9]

Thus, absent a decision by the Corps to implement an 11-mile dredge, no EIS on such a project is required, and no failure to act claim can be stated.  While Riverkeeper presents evidence that JaxPort has prioritized the first 11-miles of the dredging project, believes it could save money by stopping the project at River Mile 11, and likely hopes to stop at River Mile 11, whether JaxPort ultimately asks the Corps to do so depends on

---

[9] Indeed, Riverkeeper's contention that the Court should require the preparation of an EIS based on evidence that a switch to an 11-mile dredge is likely or even imminent is akin to the approach utilized by the Court of Appeals in the <u>Kleppe</u> case, which the Supreme Court rejected.  In <u>Kleppe</u>, the Court of Appeals devised a four-part test to determine the point in the contemplation of a plan that the agency must begin preparing the environmental impact statement.  <u>See</u> <u>Kleppe</u>, 427 U.S. at 404-05.  Notably, one of those factors was the "likelihood and imminence of the program's coming to fruition."  <u>See</u> <u>id.</u> at 405.  The Supreme Court flatly rejected this approach as contrary to the language of the statute.  <u>Id.</u> at 405-06. While Riverkeeper's evidence may indicate that a switch to an 11-mile dredge is likely, or even imminent, until the Corps has actually decided to make this change, the Court cannot intervene to require the preparation of an EIS.  <u>See</u> <u>id.</u> at 406 & n.15.

numerous variables, not the least of which is JaxPort's ability to negotiate a move of the MOL terminal. The Corps is not required to prepare an EIS on merely contemplated actions. See id. at 410 n.20; see Sand, 629 F.2d at 1015-16. Accordingly, to the extent Riverkeeper would ask the Court to construe the claim in Count I as a failure to act claim, Count I of the Amended Complaint is due to be dismissed.

To the extent Riverkeeper has attempted to characterize the actions of JaxPort and the Corps with respect to the possibility of shortening the dredge project as an evasion of NEPA's requirements, the Court finds this characterization to be unwarranted on this record.[10] It is undisputed that the Corps devoted substantial time and resources to the preparation of the April 2014 Report. Indeed, from the time of the initial Notice of Intent until the issuance of the final April 2014 Report, the Corps spent seven years studying the environmental and economic impacts of deepening the St. Johns River. Based on this

---

[10] Riverkeeper argues that the "11 mile dredge alternative was required to be studied by the Corps early in the process when other dredging lengths and depths were analyzed." See Riverkeeper Motion at 16. However, Riverkeeper fails to allege that the 11-mile dredge was a "reasonable, non-speculative alternative" at the time the Corps was undertaking its analysis. See N. Buckhead Civic Ass'n, 903 F.2d at 1541 (explaining that the requirement to consider alternatives is "bounded by 'some notion of feasibility,' and consideration need be given only to reasonable, non-speculative alternatives" (quoting Piedmont Heights Civic Club, Inc. v. Moreland, 637 F.2d 430, 436 (5th Cir. 1981))). JaxPort's December 2013 strategic plan presents the earliest indication of its consideration of a shorter dredge. By that time, the deepening project had been under consideration for six and a half years and the draft of the April 2014 Report had been released for public comment some six months earlier. Moreover, Riverkeeper acknowledges in its Motion that JaxPort did not begin negotiating to relocate the MOL terminal, a necessary component to the viability of an 11-mile dredge, until February 2016, nearly two years after the Corps issued the April 2014 Report. See Riverkeeper Motion at 16. Thus, the Court finds unpersuasive Riverkeeper's contention that in the preparation of the April 2014 Report, the Corps "ignore[d] the alternative that is now being pursued" and as a result "violated the very heart of NEPA." Id.

Likewise, this is not a case where the Corps has improperly segmented a project in a manner that skews the environmental impacts analysis. As such, Riverkeeper's reliance on Florida Wildlife Federation v. U.S. Army Corps of Engineers, 401 F. Supp. 2d 1298 (S.D. Fla. 2005) is misplaced. See Riverkeeper Motion at 17, 20. In Florida Wildlife Federation, the Corps had considered only a portion of a larger project to develop federally regulated wetlands and as such, failed to evaluate the significant environmental issues implicated by the project as a whole. See Fla. Wildlife Fed'n, 401 F. Supp. 2d at 1316-17. Here, the Corps has devoted substantial time and resources to studying the environmental impacts of the project in its entirety. Indeed, Riverkeeper conceded at the Hearing that the environmental impacts of the 11-mile dredge are no different than those of the 13-mile dredge.

study, the Corps ultimately recommended a dredging project to River Mile 13. Before raising the Hurricane Irma arguments, discussed below, Riverkeeper had not moved in this Court to halt the start of the 13-mile dredge. Thus, even if Riverkeeper were correct that the Corps cannot proceed with an 11-mile dredge until it has completed an appropriate study, Riverkeeper fails to explain why that would entitled it to an injunction against any dredging at this point in time. Given that the Corps is authorized to complete the 13-mile dredging project, it appears that the only appropriate relief for the failure to study the 11-mile dredge would be an injunction prohibiting the Corps from dredging unless it intends to dredge to River Mile 13.[11] Plainly, additional dredging is not the outcome that Riverkeeper is seeking. Nonetheless, the Court need not determine what the appropriate injunctive relief would be as the claim in Count I is due to be dismissed.

### B. Count II: Hurricane Irma

As to Count II of the Amended Complaint, the Court first clarifies which arguments are no longer before the Court. At the time Riverkeeper filed its Motion, the only action the Corps had taken to consider the impact of the historic flooding following Hurricane Irma on the dredging project was the issuance of the November 30, 2017 scoping letter. As such, in the Motion, Riverkeeper argued that Hurricane Irma presented new information requiring the preparation of an SEIS and that the Corps violated NEPA by failing to consider Hurricane Irma. In its Motion to Dismiss, the Corps asserted that it had no duty to consider Hurricane Irma because it had already issued the ROD, and alternatively, that

---

[11] Indeed, to obtain preliminary injunctive relief, Riverkeeper must establish that it is likely to suffer irreparable harm if the Corps is permitted to begin the alleged 11-mile dredge. See Winter, 555 U.S. at 22. Given the posture of this action with respect to the currently authorized 13-mile dredging project, the Court questions whether Riverkeeper could establish that an 11-mile project is likely to produce harm different from a 13-mile dredge that constitutes irreparable harm.

Riverkeeper's claim was due to be dismissed on mootness and ripeness grounds because the Corps was in the process of reviewing the data from Hurricane Irma. The Corps raised the same arguments in its Response and attached the recently-issued Draft SEA and the Draft FONSI. At the Hearing, the Corps informed the Court that it had finalized the SEA and FONSI. Accordingly, the Corps withdrew its argument that it had no duty to act in response to Hurricane Irma, and agreed that its ripeness argument was no longer applicable. In addition, the parties agreed that Riverkeeper's failure to act claim with regard to the Irma information was moot, such that the sole issue remaining before the Court at this time as to Count II is whether the Corps' decision not to prepare an SEIS addressing Hurricane Irma is arbitrary and capricious.

Significantly, the decision of whether to prepare a supplement is "made in light of an already existing, in-depth review of the likely environmental consequences of the proposed action," in this case, the April 2014 Report. See Wisconsin v. Weinberger, 745 F.2d 412, 418 (7th Cir. 1984). Thus, under the circumstances presented here, the Corps must prepare an SEIS if there is new information from Hurricane Irma which shows that the dredging project "will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered . . ." in the April 2014 Report. See Marsh, 490 U.S. at 374 (emphasis added). In reviewing the Corps' decision not to prepare an SEIS, the Court must determine whether the Corps has taken a "hard look" at the allegedly new information. See Suncoast Pkwy. Case, 295 F.3d at 1216. The Corps will have satisfied its NEPA obligations if it has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Id. (internal quotation omitted). Whether Hurricane Irma

provided significant new information relevant to the dredging project is a "factual dispute the resolution of which implicates substantial agency expertise," such that the Court must not set aside the Corps' decision unless it is arbitrary and capricious. <u>Marsh</u>, 490 U.S. at 376.

Riverkeeper argues that the flooding which occurred following Hurricane Irma is significant new information requiring the preparation of an SEIS based solely on the Affidavit of Dr. Jeremy Stalker. The Corps responds to Stalker's contentions in the SEA. The Stalker Affidavit and the SEA are the only evidence before the Court addressing whether there is significant information from Hurricane Irma relevant to the dredging project which was not previously considered. Thus, based on this <u>extremely</u> limited record, the Court must determine whether Riverkeeper is substantially likely to prevail in establishing that the Corps' determination in the FONSI was arbitrary and capricious.

Stalker has a PhD in geological earth sciences and is currently an associate professor of biology and marine science at Jacksonville University. <u>See</u> Stalker Aff. ¶¶ 4, 8. The main thrust of the Stalker Affidavit is not actually directed to the significance of Irma, but rather, Stalker's opinion that the modeling analysis utilized by the Corps in preparing the April 2014 Report "does not accurately predict flooding caused by the anticipated dredging." <u>See</u> <u>id.</u> ¶ 20. Stalker asserts that the Corps' modeling is deficient in two ways: it fails to account for the way rainfall and inflows from tributaries interact with storm surge during a storm event to impact flooding, and it contains artificial boundaries which conceal the impact of flooding. <u>Id.</u> ¶¶ 21-22. Notably, Stalker does not identify how the Corps could more accurately model the dredging project's impact on flooding, nor does Stalker indicate that he has done such an analysis. Rather, Stalker attaches only a "general" model of

points along the river which are "susceptible to flooding." Id. ¶ 18, Ex. 1. While Stalker states that increases in storm surge and tide heights will exacerbate flooding, id. ¶ 17, he does not explain his methodology in reaching this conclusion, identify the degree to which the dredging project will exacerbate flooding, or opine on how the Corps could more precisely determine the impact of dredging on flooding.

With respect to any new information made available by Hurricane Irma, Stalker opines that:

> The flooding caused by Irma represents the best information now available for use in modeling the potential flooding impacts of activities that affect the St. Johns River and its flood plain in Jacksonville and surrounding areas. Irma flooding represents the most recent and most detailed information available related to flooding and should be taken into account in any modeling intended to gauge the potential extent of flooding increases from dredging the St. Johns River.

See id. ¶ 16. Stalker points out that the Corps' "predictions of increased tide and storm surge height due to dredging were made using pre-hurricane Irma data," and posits that "[i]f the Corps model was run with data from Irma, even with its existing deficiencies, it is likely that it would predict that still greater flooding would be caused by the dredging— although some of the deficiencies will likely obscure and minimize the full effects." Id. ¶¶ 17, 19.

In the SEA, the Corps addresses the concerns raised by Stalker. First, as to Stalker's critique of the "artificial boundaries" in the Corps' modeling, the Corps explains that the "storm surge hydrodynamic modeling for the Jacksonville Harbor Navigation Project deepening was based on Federal Emergency Management Agency (FEMA) Georgia and Northeast Florida Coastal Storm Surge and Mapping Study." See SEA at 10. The Corps elaborates on the physical domain of the model, and states that:

the effective limit of the model's capability to model water surface elevations without any boundary interference due to tide, storm surge, sea level rise, or local wind effects is 10 meters (m; 32.8 ft), which is significantly higher than any simulated water surface elevations conducted with this model application which shows that there are no artificial boundaries within the flood plain of the [Lower St. Johns River].

Id. In the SEA, the Corps also addresses Stalker's critique as to its failure to account for rainfall inflows. The Corps acknowledges that it "did not include rainfall runoff input in the ADCIRC Storm Surge model." However, the Corps explains that "[t]he channel deepening primarily effects water levels in the [Lower St. Johns River] due to ocean tide and storm surge. Variations in storm events related to rainfall and local wind within the river do not significantly change the with- and with-out project effect on water levels in the [Lower St. Johns River]." Id. The Corps explains that the interaction between storm surge and rainfall can increase peak water levels, which can be estimated generally, but "[t]he location of this increase will depend on the timing between the rainfall runoff and the peak storm surge therefore the location of highest water levels will change location depending on the rainfall and surge characteristics of each storm event." See id. at 13. Regardless, the Corps reasons that although its models did not include rainfall runoff, "the storm surge modeling with 50- and 100- year storm events represent a worst case scenario, in that both of these synthetic storm events' water levels meet or exceed the maximum water levels observed in the [Lower St. Johns River] for the historic major Hurricanes Dora, Matthew, and Irma." Id.

Finally, as to Stalker's critique that the Corps' storm surge models need to be updated with data from Irma, the Corps responds that the water levels observed during Irma are within the parameters of the modeling used by the Corps. Specifically, in the April 2014 Report, the Corps calculated the effect the dredging project would have on water

levels in the Lower St. Johns River by comparing the maximum water surface elevation levels in the Lower St. Johns River during hypothetical 50- and 100-year storm events at existing channel depths and at a 47-foot channel depth. See April 2014 Report, App. A, Attach. J. To determine whether recent storm events constituted new information relevant to its modeling, the Corps compared the water level measurements and high water marks for Hurricanes Dora, Matthew and Irma to the water level measurements used in the Corps' modeling of the hypothetical 50- and 100- year storms. See SEA at 13. The Corps found that it had "modeled events comparable to or more severe than Hurricane Irma." See id. In other words, according to the Corps, the maximum water surface elevations used in its modeling were equal to or higher than any water level measurement or high water mark observed following Hurricane Irma. As such, the Corps concluded that "recent storm events and flooding in the vicinity of the Jacksonville Harbor Navigation Project do not constitute significant new circumstances or information relevant to environmental concerns bearing on the project or its impacts." Id.

The Court has carefully considered the Stalker Affidavit, the SEA, and the original April 2014 Report. On this limited record, it appears that the Corps has taken a "hard look" at the Stalker Affidavit and the events of Hurricane Irma. Riverkeeper fails to present any evidence that the Corps' determination that Hurricane Irma did not generate "new information" is arbitrary and capricious.[12] Notably, Stalker does not explain how modeling

---

[12] At the Hearing, Riverkeeper asserted that the Corps had not taken a sufficiently "hard look" because of the expedited way in which it prepared the SEA and FONSI during the holiday period. However, the Court finds this argument unpersuasive. Riverkeeper did not raise the issue of Hurricane Irma until after the Corps had entered into a contract to begin dredging in December of 2017. Indeed, it appears Riverkeeper did not present the Corps with Stalker's critiques until the filing of the Riverkeeper Motion almost a month later on December 4, 2017. Thus, it appears to have been the timing of Riverkeeper's challenge that resulted in the Corps' expedited preparation of the SEA and FONSI over the holidays. Moreover, the SEA shows that Riverkeeper had sufficient time to submit its comments to the Draft SEA for the Corps' review, and the Corps responded substantively to those comments. See SEA at 20-21, 31-35. Thus, by circulating the November

the water levels from Hurricane Irma would change the outcome of the Corps' analysis given that the Corps previously modeled a hypothetical 50-year storm event which encompassed and surpassed the high water level experienced during and after Irma. Indeed, Stalker himself does not actually opine that running the Corps' modeling the data from Hurricane Irma <u>would</u> affect the result. Stalker suggests only that it is "likely" that the Corps' models would show greater flooding if run with data from Irma, but then limits even this opinion with the caveat that the models might not show the "full effects" of Irma due to what he perceives as deficiencies in the models. <u>See</u> Stalker Aff. ¶ 19. Likewise, while Stalker criticizes the Corps' storm surge models, he has not come forward with his own models to demonstrate the extent to which dredging would affect flooding, nor does he identify the methodology for flood modeling that he contends would be more appropriate. Based on the limited record before the Court, the Corps appears to have examined Stalker's critiques and offered facially reasonable explanations in response, which Riverkeeper has not rebutted. While Riverkeeper may be able to establish at a later stage in the proceedings that the Corps' models are flawed, on this record, with only the brief and

---

30, 2017 scoping letter and the December 14, 2017 Draft EA, the Corps appears to have involved the public "to the extent practicable" in preparing its environmental assessment of Hurricane Irma. <u>See</u> 40 C.F.R. § 1501.4(b); <u>see</u> <u>also</u> <u>Del. Dep't of Natural Res. & Envmtl. Control v. U.S. Army Corps of Eng'rs</u> (<u>Delaware River Case</u>), 685 F.3d 259, 272-73 (3d Cir. 2012).

        In addition, Riverkeeper argued that the Corps failed to comply with a mandatory 30-day public comment period. However, as addressed at the hearing, upon review of the relevant regulations, the Court finds that public circulation for a 30-day comment period does not apply in the circumstances present here. <u>See</u> <u>Delaware River Case</u>, 685 F.3d at 274-75 (stating that "neither CEQ nor Corps regulations impose a universal requirement to circulate draft EAs before publication" and concluding that the river deepening project did not fall within any of the categories for which public dissemination of an EA would be mandatory under 33 C.F.R. § 230.11); <u>see</u> <u>also</u> 33 C.F.R. § 230.11 (requiring circulation of a draft FONSI and EA for a minimum 30-day review period "[i]n the case of feasibility, continuing authority, or special planning reports and certain planning/engineering reports"); 40 C.F.R. § 1501.4(e). Indeed, in <u>Fund for Animals, Inc. v. Rice</u>, 85 F.3d 535 (11th Cir. 1996) the Eleventh Circuit observed that there was "no legal requirement that an Environmental Assessment be circulated publicly and, in fact, they rarely are." <u>See</u> <u>Fund for Animals, Inc.</u>, 85 F.3d at 549. As such, the procedures the Corps used to prepare the SEA and FONSI do not indicate a failure to take a "hard look" at the information from Hurricane Irma.

largely conclusory opinions of Stalker, the Court cannot find that the Corps' analysis in the SEA is arbitrary and capricious.

Notably, Stalker criticizes the Corps' modeling analysis because it "is not a flood model as it is stated as being, it is a storm surge model. It does not accurately predict flooding caused by the anticipated dredging. Flooding is more complex than simply increased surges." See Stalker Aff. ¶ 20. Stalker further asserts that "[i]t is incorrect to say, as the Corps did in the [April 2014 Report] that the project will not induce and [sic] increase in flooding." Id. ¶ 17. However, Stalker does not identify where in the Report that the Corps stated the project would not induce any increase in flooding. It appears he may be referencing the statement that "[t]his project would have no adverse impacts to flood plain management." See April 2014 Report at 262. However, absent evidence to the contrary, the Court does not interpret this statement to mean that there will be no increase in flooding. Moreover, contrary to Stalker's assertion, the Corps does not identify its storm surge analysis as being a "flood model." See April 2014 Report, App. A, Attach. J. Indeed, the Corps appears to agree with Stalker that "[f]looding is more complex than simply increased surges." See SEA at 17. The Corps' position appears to be that modeling the difference in tides and storm surge is the appropriate way to consider the environmental impact of dredging because flooding is contingent on numerous other variables not related to dredging. Notably, Stalker does not explain the scientific analysis of flooding that he contends is missing from the April 2014 Report. Beyond the tide and storm surge models included in the April 2014 Report, Stalker does not identify what additional "flood" models, recognized in the scientific community, are absent from the Corps' analysis. Stalker himself does not appear to have performed such an analysis, and Riverkeeper does not

otherwise present the Court with any scientific studies or analyses demonstrating how dredging will impact flooding in the Lower St. Johns River that the Corps failed to consider. Thus, Riverkeeper has not demonstrated any "new information" regarding dredging-induced flooding that would require the preparation of an SEIS.

In reaching this conclusion, the Court notes that preparation of an SEIS is required where there is new information relevant to environmental concerns that was not previously considered. See Van Antwerp, 526 F.3d at 1360. Here, the record reflects that the Corps has considered the impact of the proposed dredging using high water levels equal to, or in most cases, higher than experienced during or following Hurricane Irma. Thus, even if Hurricane Irma represents the most recent information, Riverkeeper fails to suggest how it presents new information that was not "previously considered." See id.; see also Wisconsin, 745 F.2d at 418 ("[T]he principal factor an agency should consider in exercising its discretion whether to supplement an existing EIS because of new information is the extent to which the new information presents a picture of the likely environmental consequences associated with the proposed action not envisioned by the original EIS." (emphasis added)).

It is true that separate and apart from the concerns regarding Hurricane Irma, Stalker challenges the accuracy of the Corps' modeling in the April 2014 Report. However, these critiques of the Corps' models are not specific to Irma, but present a more general challenge to their ability to accurately predict flooding. These models have been available for scientific review and critique at least since the Corps issued the April 2014 Report. And, Riverkeeper has long been aware of the April 2014 Report and has closely followed the development of the plan to dredge the river. It is unclear whether anyone criticized the

Corps' storm surge modeling or the lack of a more elaborate flooding analysis before the eve of dredging. If not, then as noted by the Supreme Court in <u>Marsh</u>, the failure of a party such as Stalker, Riverkeeper, or any other scientist to apprise the Corps of the purported deficiencies with its modeling technique could cast doubt on the significance of those concerns. <u>See</u> <u>Marsh</u>, 490 U.S. at 379-80.

Regardless, a challenge to the Corps' alleged failure to consider dredging-induced flooding and its impact on the human environment goes to the sufficiency of the April 2014 Report, not new information from Hurricane Irma. While these are serious concerns, they are not the concerns that form the legal basis of Riverkeeper's request for preliminary injunctive relief. Whether or not the Corps adequately considered the impact and extent of any dredging-induced flooding in the April 2014 Report is not the claim currently before this Court. Riverkeeper may pursue such a claim in its Amended Complaint, but for purposes of the instant Motion, Riverkeeper moved to enjoin the dredging project only on the basis of the claims alleged in Counts I and II. With respect to Count I, the Court has determined that Riverkeeper's claim regarding the alleged 11-mile dredge is due to be dismissed for lack of subject-matter jurisdiction. With respect to Count II, which is limited to the Corps' alleged failure to prepare a supplemental environmental impact statement in light of the "new information" presented by Hurricane Irma, the Court finds that Riverkeeper has failed to show a substantial likelihood of success on this claim. On the record before the Court, for purposes of the request for preliminary injunctive relief, the Court finds that the Corps appears to have taken the requisite "hard look" at the data from Hurricane Irma.[13] The

_____

[13] Riverkeeper's request for preliminary injunctive relief is before the Court on an expedited schedule such that the factual record is limited. Although the Court has determined that Count I is due to be dismissed, Riverkeeper may proceed with its failure to supplement claim in Count II. Therefore, the Court emphasizes that its findings of fact and conclusions of law regarding supplementation do not necessarily reflect what may

Corps concluded that Hurricane Irma does not present significant new information not previously considered in the April 2014 Report, and on this limited record, Riverkeeper fails to show that such a decision is substantially likely to have been arbitrary and capricious. In light of the foregoing, because the Riverkeeper Motion is based only on Counts I and II of the Amended Complaint, it is due to be denied, and the Corps Motion with respect to those Counts is due to be granted, in part, and denied, in part.

Accordingly, it is

**ORDERED**:

1. Plaintiff's Motion for Preliminary Injunction and Memorandum of Law (Doc. 24) is **DENIED**.

2. Federal Defendant's Motion to Dismiss Counts I and II of Plaintiff's First Amended Complaint (Doc.32), to the extent not previously withdrawn, is **GRANTED, in part, and DENIED, in part.**

   A. With respect to Count I of the Amended Complaint, the Motion is **GRANTED**. The claims raised in Count I of the Amended Complaint are **DISMISSED without prejudice.**

   B. With respect to Count II of the Amended Complaint:

      a. The Motion is **GRANTED** to the extent Riverkeeper's claim that the Corps failed to consider Hurricane Irma at all is dismissed as moot.

      b. To the extent not previously withdrawn, the Motion is otherwise **DENIED**. Riverkeeper may proceed in Count II with its challenge

---

be established by a review of the complete administrative record. Accordingly, the determinations in this Order as to Count II are expressly limited to the record before the Court at this time, and should not be interpreted as a final decision regarding any disputed issues.

to the Corps' decision not to prepare a supplemental environmental impact statement to address Hurricane Irma, as set forth in the SEA and FONSI.

**DONE AND ORDERED** in Jacksonville, Florida, this 19th day of January, 2018.

MARCIA MORALES HOWARD
United States District Judge

lc11
Copies to:

Counsel of Record